THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v.
TOMMY RIDDLE, Defendant-Appellee.

Second District    No. 2—92—0991

Opinion filed February 22, 1994.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers,
Robert J. Biderman, and James L. Overholt, all of State's Attorneys
Appellate Prosecutor's Office, of counsel), for the People.

G. Joseph Weller and Kathleen J. Hamill, both of State Appellate
Defender's Office, of Elgin, for appellee.

JUSTICE WOODWARD delivered the opinion of the court:
The State appeals from the order of the circuit court which
granted the motion of defendant, Tommy Riddle, to suppress evi-
dence seized pursuant to a search warrant. In challenging the court's
ruling, the State raises two issues: (1) whether the police officers exe-
cuting the warrant "knocked and announced" before battering in
defendant's door; and (2) whether the presence of "pit bull" dogs at
defendant's residence created exigent circumstances authorizing a
"no-knock" entry.
Defendant was indicted for armed violence (Ill. Rev. Stat. 1991,

ch. 38, par. 33A—2 (now 720 ILCS 5/33A—2 (West 1992))), the unlawful possession of a substance containing cocaine (Ill. Rev. Stat. 1991, ch. 56$^1$/$_2$, par. 1402(a)(2)(A) (now 720 ILCS 570/402(a)(2)(A) (West 1992))), the unlawful possession of a controlled substance with the intent to deliver (Ill. Rev. Stat. 1991, ch. 56$^1$/$_2$, par. 1401(a)(2)(A) (now 720 ILCS 570/401(a)(2)(A) (West 1992))), the unlawful possession of cannabis with the intent to deliver (Ill. Rev. Stat. 1991, ch. 56$^1$/$_2$, par. 705(d) (now 720 ILCS 550/5(d) (West 1992))), and the unlawful possession of cannabis (Ill. Rev. Stat. 1991, ch. 56$^1$/$_2$, par. 704(d) (now 720 ILCS 550/4(d) (West 1992))). The charges were based on evidence seized from defendant's home during the execution of a search warrant. Defendant moved to suppress the evidence on the basis that the police officers used excessive force in executing the warrant.

Steve Engelhard, a friend of defendant's son, testified that he went to defendant's home around 4 p.m. on October 4, 1991, to visit defendant's son. Engelhard sat and watched TV while waiting for defendant's son to come home. Engelhard got up to change the channel of the TV and was five to six feet from the front door, when the door was knocked down and the police SWAT team came in. He did not hear anyone knock or announce the police presence before the door was broken in.

Officer Eric Lundahl testified that he was a team leader with the Northern Illinois Police Alarm System (NIPAS), a SWAT team. About a week before October 4, 1991, Metropolitan Enforcement Group (MEG) Agents Budny and Agos advised Lundahl that they might need the services of NIPAS in executing a search warrant for defendant's home. The MEG agents told Lundahl that they were concerned about safety as they had information that defendant carried a handgun, weapons would be inside the residence, and there were "pit bulls" on the property. Lundahl was told that there were at least four, and as many as nine, dogs.

Lundahl further testified that the day of the execution of the search warrant, the NIPAS team met with the MEG agents to plan the entrance. The NIPAS team brought a $CO_2$ fire extinguisher to deal with the dogs. The plan was for Donald Hohs to open the screen door of the house. James Kuzynowski was to knock and announce. If there was no response, Kuzynowski would use a battering ram to break in the door.

The NIPAS team arrived in a van. The van was parked so that it was hidden from view from the house. The 10 NIPAS agents left the van and ran towards the house. Lundahl was the fifth person out of the van. He did not recall hearing anyone announce the police presence until the door was already being battered or had been broken in and the officers were entering the house. Lundahl noticed

that there were two "pit bulls" in a dog run outside the house. There were no dogs inside the house.

Officer Jeffrey Schirmbeck, of NIPAS, testified that he was the fourth person out of the van. As he was getting to the porch, the door was being broken down. Kuzynowski said "police, search warrant," and then Schirmbeck heard Kuzynowski hit the door with the battering ram. Schirmbeck stated that he did not hear anyone knock on the door before Kuzynowski hit it with the battering ram.

James Kuzynowski testified that he was the second person out of the van. Hohs opened the screen door, and Kuzynowski knocked and announced "police, search warrant." Kuzynowski paused for a couple of seconds and then hit the door with the battering ram.

Officer Thomas Armstrong, of MEG, testified that he was in an undercover vehicle driven by Agent Budny. The car was parked a quarter mile from defendant's house, across Green Bay Road. Armstrong was watching the street with binoculars. Although it was dusk and it was raining, Armstrong saw the SWAT team arrive. Armstrong stated that he saw "an attempt to knock" or "what appeared to be a knock." He also heard a muffled yell. Nearly all of the 10 NIPAS officers were on the porch at that time. Armstrong did not recall seeing a battering ram or hearing the door being struck. He estimated that 15 to 20 seconds elapsed from the time the first person knocked on the door until the door was opened.

Agent Brian Budny of MEG testified that he could not see the front porch of defendant's house from where he and Armstrong were parked. Budny was driving the car as the NIPAS van pulled up. As Budny was crossing Green Bay Road, the NIPAS team was approaching the house, and after Budny crossed the road, he saw the team entering the house. He never saw the team members on the porch. When Budny pulled up, Agent Agos was standing in the driveway, and the NIPAS team members were already in the house. Budny stated that he had no information about "pit bulls," except what Agos told him.

Agent Thomas Agos testified that he was the primary investigator for the case. Agos saw the entry team running towards the front door. According to Agos, there were five or six NIPAS agents. Agos testified that the screen door was opened, and he heard one officer yell "police, search warrant." That officer waited three to five seconds and then battered in the door. Agos was standing in the driveway with Tony Gordon of the Waukegan News-Sun newspaper when the entry was made.

Tony Gordon, a reporter for the News-Sun, testified that he was riding in Agos' vehicle that day when there was a radio dispatch that the NIPAS team was starting its assault. Agos pulled onto Green

Bay Road, drove south, and turned onto defendant's street. Agos parked the car east of the driveway. Gordon stated that he could not see the front of the house until he got out and moved forward from the car. At that point, Gordon saw one NIPAS officer standing in the doorway. The front door of the house was already open, and the entry had been made. Gordon further testified that there were dogs on the premises, but he was "not sure whether they were pit bulls or another type" of dog.

In addition to this testimony, defendant introduced a videotape depicting his street and how it looked from Officer Armstrong's vantage point across Green Bay Road.

The State moved for a directed finding on the motion. The court found that, based on the videotape, Armstrong was not in a position to see a knock on the door or to hear anything. The court therefore found Armstrong's testimony not credible. The court also found that Agos' testimony was impeached by Gordon's account. The court determined that the testimony of the NIPAS team members was credible and that it established that there was a knock and an announcement and that Kuzynowski waited a few seconds and then battered in the door. However, the court ruled that there were not sufficient facts to show exigent circumstances to justify the officers' waiting such a short time before breaking in the door. The court therefore denied the motion.

The State recalled Agos to testify in its case. Agos stated that an examination of defendant's garbage in July 1991 revealed a 50-pound bag of dog food. On one occasion, Agos heard a dog barking while he was conducting surveillance of the property. In addition, a police officer who lived near defendant told Agos that "there were pit bull dogs on the property." On August 27, 1991, Agos saw two dogs in the dog run, and he recognized them to be "pit bulls." Agos did not know how many dogs were on the property. When the prosecutor asked Agos if he had any personal knowledge about "pit bulls," he responded:

> "My personal knowledge, although I've never been in close contact with a pit bull, is I understand they are vicious attack dogs, and the closest that I have come to that knowledge is one of our officers being attacked by a pit bull to the point where that officer had to shoot the pit bull."

Agos admitted that the incident occurred a few years earlier, and the officer involved was on the owner's property and the dog came after him. However, the dog did not bite the officer, and Agos did not know if the officer killed the dog. Agos also admitted that he did not include anything about "pit bulls" in his reports on the investigation, even though the presence of the dogs made it a "high-risk search warrant."

Agos did not include anything in the affidavit for the search warrant about any danger in executing the warrant. He stated that the warrant was not a "no-knock" warrant, but he asked for NIPAS participation because of the possibility of encountering dogs.

The last witness, Donald Hohs, testified that he was the first person out of the NIPAS van. He knocked twice on the screen door and pulled it open, announcing "Police. Open up." Hohs stated that Kuzynowski also knocked and announced the police presence. Kuzynowski paused momentarily and then hit the door with the battering ram. Hohs stated that he was told it would be a high-risk entry because the occupants were armed, and there were five Rottweilers in the house.

In ruling on the motion, the court found that the NIPAS team "knocked and hit the door almost immediately open with the ram," because they were expecting a high-risk situation. The NIPAS team relied in good faith on the representations of Agos. However, the court found that Agos' testimony was not credible. The court explained:

> "I believe when the team approached, the dogs were still outside in the pen ***. Even if I find Agos' testimony to be credible which credibility has been strained by other evidence in this case, I do not think that the information he has was sufficient to justify an exigent entry into the residence.
>
> The fact that there were two dogs outside in a pen does not give them exigent circumstances in my opinion. Now, it is the information that was transmitted to the N.I.P.A.S. team that they believed that there were going to be several dogs inside the residence, and I don't know how that ever came about, how that information was distorted to indicate several dogs inside of the residence, but with the lack of paper work concerning this aspect of the case it may more just have been rumor and word of mouth than anything else as to how they believed they were going to encounter all these dogs."

The court found that defendant met his burden to show that there were no exigent circumstances to justify the manner of entry. The court therefore granted defendant's motion. The State filed a certificate of impairment and timely appealed.

A reviewing court may not disturb a trial court's ruling on a motion to suppress evidence unless that ruling was manifestly erroneous. (*In re D.G.* (1991), 144 Ill. 2d 404, 408.) In addition, we will defer to the trial court's determination of the credibility of the witnesses and its resolution of the conflicts in the testimony. (*People v. Melock* (1992), 149 Ill. 2d 423, 432.) The trial court discredited the testimony of both Officer Armstrong and Agent Agos. We will therefore not

consider the testimony of either officer. The court also resolved the conflict between the testimony of Hohs and the testimony of Lundahl and Kuzynowski in favor of the latter two's account that Hohs' duty was only to open the screen door and Kuzynowski was the only officer who knocked.

The court found that the knock and announcement, and the battering in of the door, occurred simultaneously. The State contends that the evidence shows that the officer properly "knocked and announced" before battering in defendant's door. The State relies on *People v. Saechao* (1989), 129 Ill. 2d 522, in support of its contention. In *Saechao*, the police officers executing a search warrant went to the defendant's house at 10:30 a.m. One officer knocked on the door three times and announced that he was from the sheriff's office. One of the knocks caused the unlatched door to swing open. The officers remained on the threshold for 5 to 10 seconds before entering the house. The supreme court held that the manner of executing the warrant was proper. *Saechao*, 129 Ill. 2d at 532.

The State's reliance on *Saechao* is misplaced. The supreme court's ruling upheld the trial court's decision, and it noted that the appellate court's conclusion that the announcement and entry were simultaneous was unsupported by the record. (129 Ill. 2d at 533.) Here, the State must show that the court's finding that the knock, announcement, and breaking in were simultaneous is manifestly erroneous. *Saechao* declined to rule whether, in every case, some time must pass between the announcement and the entry. 129 Ill. 2d at 533.

Moreover, *Saechao* is factually distinguishable because the officer knocked three times and, once the door swung open, the officers were in a vulnerable position. (129 Ill. 2d at 533.) Here, the officers were not in such a vulnerable position, and the court found there was only one knock. The State has not shown that the court's finding was wholly unwarranted, unreasonable, or not based on the evidence. (See *People v. Leach* (1993), 245 Ill. App. 3d 644, 655.) On the contrary, the testimony of Kuzynowski, Lundahl, and Schirmbeck amply supports the trial court's finding that the knock, announcement, and battering were simultaneous.

"[A] person should be afforded sufficient opportunity to respond to authority before a forcible entry is made." (*Saechao*, 129 Ill. 2d at 533.) There are no rigid rules for determining whether the police have allowed sufficient time before forcing entry into a dwelling. (129 Ill. 2d at 533.) The court here found that the pause of only a few seconds before breaking in the door was not sufficient to allow defendant to respond. Thus, we must turn to the State's second contention,

that exigent circumstances justified the police conduct. See *People v. Jennings* (1990), 204 Ill. App. 3d 1075, 1078-79 (whether a defendant was given sufficient time to respond depends on the presence and nature of exigent circumstances).

At the time the search warrant was executed, Illinois did not have a "knock and announce" statute. (See 725 ILCS 5/108—8(b) (West 1992).) The supreme court, in *People v. Condon* (1992), 148 Ill. 2d 96, set forth the standards which govern our analysis.

"Since Illinois has no statutory requirement that officers knock and announce their authority and purpose prior to entering a dwelling, the propriety of such an entry must be determined by constitutional standards. [Citation.] Although the failure of law enforcement officers to knock and announce is not a *per se* constitutional violation, the presence or absence of such an announcement is an important consideration in determining whether a subsequent entry to arrest or search is constitutionally reasonable. [Citations.] The purpose of the knock-and-announce rule is to notify the person inside of the presence of police and of the impending intrusion, give that person time to respond, avoid violence, and protect privacy as much as possible. [Citation.] Officers may be excused from the knock-and-announce requirement if exigent circumstances exist sufficient to justify the intrusion. [Citation.] Where exigent circumstances exist, the failure of the police to knock and announce their authority and purpose in the execution of a search warrant for narcotics does not violate the fourth amendment right against unreasonable searches and seizures. [Citation.] Exigent circumstances may encompass such considerations as danger to the police officers executing the warrant, or the uselessness of the announcement, or the ease with which the evidence may be destroyed." (*Condon*, 148 Ill. 2d at 102-03.)

The State asserts that the guns, cocaine, and "pit bulls" created the exigent circumstances necessary for a "no-knock" entry.

Like the supreme court in *Condon*, we disagree with the State that drugs plus weapons equal exigent circumstances. *Condon* rejected a "synergistic" analysis and examined each factor individually. (148 Ill. 2d 103-04.) *Condon* noted that where there was no evidence to indicate that the police reasonably believed a gun would be used against them, the need for compliance with the knock-and-announce rule is even greater. (148 Ill. 2d at 106-07.) Similarly, *Condon* required the warrant or the record to show that the occupants of the premises had devised a means for the quick destruction of evidence; otherwise, the mere presence of drugs would not provide exigent circumstances. (148 Ill. 2d at 106-08.) Here, as in *Condon*,

there was no indication that defendant would use a gun against the police officers or that he had a quick means to dispose of the drugs. Thus, the presence of guns and drugs here does not constitute exigent circumstances sufficient to justify the simultaneous knock, announcement, and entry.

The State further argues that "the presence of pit bull dogs observed on the property" justifies the police action. The State asserts that the trial court should have taken judicial notice "of the dangerousness of these types of dogs." According to the State, "vicious dogs can be more dangerous than guns." The State's argument is wholly without merit.

First, the State presented no evidence to show what type of dogs was on defendant's property. The term "pit bull" does not define a breed of dog. A "pit bull" is defined only as a "bullterrier" (Webster's Third New International Dictionary 1724 (1986) (Webster's)), which is further defined as "a short-haired terrier of a breed originated in England by crossing the bulldog with terriers to develop a dog of speed, hardihood, and powerful bite for use in dog fights" (Webster's, at 295). A "terrier" is "any of various usu. [sic] small and rather low-built dogs (as an airedale, fox terrier, schnauzer) kept chiefly as pets but orig. [sic] used by hunters to dig for small furred game and engage the quarry underground or drive it out of its hole." (Webster's, at 2360.) Thus, merely applying the label "pit bull" to a dog does little to describe it and provides no basis for determining whether it is dangerous.

Moreover, even if we assume that by "pit bull" the State is referring to the American Staffordshire terrier ("a strong stocky terrier of a breed orig. [sic] developed for dogfighting" (Webster's, at 56a), we cannot malign a breed of dogs on the basis of rumor and hysteria. Under the Animal Control Act, a "Vicious dog" is:

"(i) *Any individual dog* that when unprovoked inflicts bites or attacks a human being or other animal either on public or private property.

(ii) *Any individual dog* with a known propensity, tendency or disposition to attack without provocation, to cause injury or to otherwise endanger the safety of human beings or domestic animals.

(iii) *Any individual dog* that has as a trait or characteristic and a generally known reputation for viciousness, dangerousness or unprovoked attacks upon human beings or other animals, unless handled in a particular manner or with special equipment.

(iv) *Any individual dog* which attacks a human being or domestic animal without provocation.
***

*** Vicious dogs shall not be classified in a manner that is specific as to breed." (Emphasis added.) (510 ILCS 5/15(a)(1) (West 1992).)

Our legislature chose not to accede to the stereotypes the State urges here. In Illinois, each dog is to be evaluated individually and is not to be classified as "vicious" merely because of its breed or type.

The State presented no evidence to show that defendant's dogs were "vicious" or dangerous, or that the officers had reason to believe that they were. The trial court properly found that the presence of two dogs, in an enclosed dog run, did not constitute exigent circumstances to justify the failure of the police officers to allow defendant sufficient time to respond to the knock and announcement before they broke in the door. We therefore conclude that the granting of defendant's motion to suppress was not manifestly erroneous.

The order of the circuit court is affirmed.

Affirmed.

QUETSCH and PECCARELLI, JJ., concur.