No. 2--04--0477

______________________________________________________________________________

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

______________________________________________________________________________

THE PEOPLE OF THE STATE ) Appeal from the Circuit Court 

OF ILLINOIS, ) of McHenry County.

 )

Plaintiff-Appellee, )

 )

v. ) No. 02--CF--635

 )

PAUL MOSER, ) Honorable,

 ) Ward S. Arnold,

Defendant-Appellant. ) Judge, Presiding.

______________________________________________________________________________

JUSTICE GILLERAN JOHNSON delivered the opinion of the court:

Following a jury trial, the defendant, Paul Moser, was convicted of unlawful possession of, with the intent to deliver, between 400 and 900 grams of cocaine (720 ILCS 570/401(a)(2)(C) (West 2002)) 
and sentenced to 12 years' imprisonment. 
 The defendant appeals, arguing that (1) the trial court erred in denying his motion to suppress; (2) he was not convicted beyond a reasonable doubt; and (3) the cumulative effect of various trial errors deprived him of a fair trial.  We affirm.

On July 25, 2002, the defendant was charged by indictment with unlawful possession of between 400 and 900 grams of cocaine and unlawful possession of, with the intent to deliver, between 400 and 900 grams of cocaine.  The indictment was based on an incident where police recovered from the defendant's residence, upon execution of a search warrant, two bags of a substance containing cocaine.

On January 3, 2003, the defendant filed a motion to suppress evidence, arguing that there was no probable cause to issue the search warrant and that the police improperly executed the search warrant.  The trial court held a two-part hearing, first considering the question of probable cause to issue the search warrant.  The trial court considered the complaint for search warrant, which is not part of the instant record, and the accompanying affidavits.  The first affidavit was signed by a confidential informant, "John Doe," who was later divulged to be Charles Petty.  In his affidavit, Petty stated that on June 28, 2002, at approximately 4 p.m., he was inside of the defendant's home located at 371 Cornell Drive in Algonquin.  While inside the home, Petty purchased 3⅛ ounces of cocaine from the defendant.  Petty observed a large quantity of cocaine in a purple bag, under a desk in the master bedroom of the home.  Petty recognized the substance in the bag as cocaine because he had purchased and used cocaine on at least 20 occasions.  Petty had purchased cocaine from the defendant on at least 15 occasions.  Petty stated that he had never been convicted of any narcotic-related offenses.  However, he was granted a personal recognizance bond on a pending narcotics charge in exchange for information concerning the defendant.

The second affidavit was signed by Inspector Rodney Penrod of the North Central Narcotics Task Force.  In his affidavit, Inspector Penrod stated that he met Petty at the Algonquin Roadhouse in February 2002, while working undercover.  He asked Petty if he had any cocaine for sale.  Petty did not have any cocaine that evening but indicated that he could possibly get some at a later date.  Inspector Penrod gave Petty his pager number and asked Petty to call him when he obtained some cocaine.  On June 27, 2002, Inspector Penrod received a page from an unfamiliar number.  Inspector Penrod called the number and spoke with Petty, who offered to sell him a few ounces of cocaine for $2,600.

On June 28, 2002, Inspector Penrod met with Petty in the parking lot of Home Depot on Randall Road in Algonquin.  Petty delivered to him a brown paper bag containing three clear plastic bags of a white powdery substance, which later field tested positive for the presence of cocaine.  Inspector Penrod placed Petty under arrest and then questioned him.  Petty told Inspector Penrod that he had obtained the cocaine from the defendant earlier that day.  Petty told Inspector Penrod that when he was at the defendant's residence, he observed two large chunks of cocaine.  Petty also told Inspector Penrod that he had purchased cocaine from the defendant about 15 to 20 times.  Inspector Penrod offered Petty a personal recognizance bond in exchange for information regarding the defendant.

After considering the above-described affidavits and the complaint for search warrant, the trial court determined that there was probable cause to issue the search warrant.  The trial court noted that the confidential informant's affidavit was specific in detail and based on personal knowledge.  The trial court also noted that the confidential informant was available to the issuing judge for questioning.  The trial court therefore denied the first portion of the motion to suppress.

The trial court next considered the question of whether the search warrant was executed properly.  Inspector Ken Stoves, with the North Central Narcotics Task Force, testified that on June 29, 2002, he assisted in a search of the defendant's residence pursuant to a search warrant that had been obtained by police the day prior.  Inspector Stoves performed three to four hours of surveillance on the residence before executing the search warrant.  During this time, Inspector Stoves observed numerous cars come and go.  It appeared to Inspector Stoves that people were in the home.

Just after midnight, Inspector Stoves, along with Inspector Penrod and other task force officers, approached the front door of the residence.  There were some lights on inside, but Inspector Stoves was unaware if anyone was awake.  Inspector Stoves looked through a window next to the front door and did not see anybody.  Inspector Stoves did not hear any noise from within the home.  Inspector Stoves wiggled the front doorknob to determine if the front door was locked.

After determining that the door was locked, Inspector Stoves pounded on the door with his fist and yelled in a clear, loud voice, "Police, search warrant."  Inspector Stoves paused for about three seconds to listen for movement, but did not hear anything.  He again pounded on the door and yelled, "Police, search warrant."  Inspector Stoves stood there for between 3 to 10 seconds and still did not hear any movement.  Inspector Penrod then rammed the door down.

Inspector Stoves, Inspector Penrod, and the other officers entered the house and secured the various rooms.  Inspector Stoves found the defendant's wife in the bedroom, in bed.  The defendant was not home.  During the search, the officers found a substance suspected to be cocaine.  Prior to entering the home, Inspector Stoves was unaware of any concerns regarding the presence of weapons or the possible destruction of evidence.

Inspector Penrod testified that he was the lead officer in the investigation.  Before he and the other officers executed the search warrant, Inspector Stoves knocked on the front door with his fist and announced "Police."  Inspector Penrod, Inspector Stoves, and the other officers then listened for movement for about three to four seconds.  They did not hear anything.  Inspector Stoves knocked on the door and announced "Police" a second time.  After the second knock, they again listened for movement for about six to eight seconds but still did not hear anything.  Inspector Penrod then broke open the door.  After he broke open the door, Inspector Penrod proceeded to the upstairs bedroom, where the defendant's wife was located.  Inspector Penrod recovered from a nightstand in the bedroom approximately 900 grams of cocaine and a scale.

Inspectors Laura Virgils and Phil Barrille of the North Central Narcotics Task Force testified consistently with Inspectors Stoves and Penrod.  According to Inspector Virgils, there were about five seconds between the first two knocks and three to five seconds between the second knock and the ramming of the door.  According to Inspector Barrille, there were approximately 10 seconds between the first two knocks and approximately 3 seconds between the second knock and the ramming of the door.

On June 4, 2003, the trial court denied the second portion of the defendant's motion to suppress.  The trial court found that the police had properly complied with the knock-and-announce rule.

On February 17, 2004, the trial court conducted a jury trial.  At the trial, Inspector Penrod testified that he met Petty in February 2002 at the Algonquin Roadhouse.  Inspector Penrod was working undercover, posing as a drug dealer.  As Inspector Penrod was getting ready to leave the bar, Petty approached him and asked him if he wanted to buy any cocaine.  Inspector Penrod said yes, but Petty was unable to obtain any that night.  Inspector Penrod gave Petty his pager number.

In June 2002, Inspector Penrod received a page from an unknown number.  Inspector Penrod called the number and spoke with Petty.  He negotiated to buy from Petty 3⅛ ounces of cocaine for $2,760.  On June 29, 2002, Inspector Penrod met Petty in the parking lot of the Algonquin Home Depot.  Petty entered Inspector Penrod's undercover vehicle and set down a brown paper bag on the passenger-side floorboard.  Petty pulled out a small plastic bag and stated that it contained an "eight ball" of cocaine.  Petty started to explain to Inspector Penrod how to test the quality of the cocaine.  Inspector Penrod gave a signal to his team, who then placed Petty under arrest.  He seized the brown paper bag, which contained three separate bags of a white powder-like substance that field tested positive for cocaine.

Inspector Penrod spoke with Petty at the Algonquin police station later that evening.  Petty provided Inspector Penrod with information regarding his supplier.  Inspector Penrod obtained a search warrant for the defendant's residence, based on the information Petty supplied.  The North Central Narcotics Task Force executed the search warrant on June 29, 2002.  Police officers found cocaine and a scale in the master bedroom of the defendant's home.  Inspector Penrod testified that Petty remained in jail while the warrant was executed.

Master Sergeant Mark Rasmussen of the North Central Narcotics Task Force testified that he participated in the execution of the search warrant on the defendant's house.  When he entered the master bedroom, he noticed a strong odor of cocaine.  The master bedroom appeared as if it were undergoing construction.  Police officers searched the room and found 610 grams of cocaine in the left-side drawer of a makeup table and 180 grams of cocaine in the right-side drawer of the table.  Police officers found another 110 grams of cocaine under the bed, packaged in 12 separate plastic baggies.  Police officers also recovered a plastic scale.  Sergeant Rasmussen testified that the amount of cocaine recovered was not an amount typical for personal use.

The State next called Petty to the stand and concurrently filed a motion 
in
 
limine
 to preclude the defendant from questioning Petty regarding a 1994 indictment for unlawful delivery of cocaine, which was ultimately dismissed in 2001.  The trial court granted the motion 
in
 
limine
.

The defendant then requested a continuance to further prepare.  The defendant explained that he was under the impression that Petty was asserting his constitutional right to remain silent 
and would not testify.  The trial court denied a continuance but recessed for an extended lunch to allow the defendant to interview Petty and prepare for his testimony.

Petty testified he had been using cocaine since before the year 2000.  Petty described himself as a "recreational user" who used cocaine only 
on weekends.  He met the defendant playing pool at the Algonquin Roadhouse.  Petty purchased cocaine from the defendant approximately 15 times.  According to Petty, his relationship with the defendant was purely social.  He never worked for the defendant in any capacity.

Petty also met Inspector Penrod at the Algonquin Roadhouse.  Inspector Penrod gave Petty a pager number.  Petty began having financial problems so he called Inspector Penrod and agreed to sell him some cocaine.  Petty contacted the defendant and told him that he had a customer and needed three ounces.  Petty and the defendant discussed a price and agreed on $2,700.

At 1:30 p.m. on June 28, 2002, Petty drove to the defendant's truck shop and picked the defendant up.  Petty and the defendant then drove to the defendant's home.  The defendant brought him upstairs into the master bedroom.  The defendant pulled out a big block of cocaine and cut off the amount Petty needed.  The defendant gave Petty two "eight balls" and three one-ounce packages of cocaine.  Petty agreed to pay the defendant after he got the money from his customer.

Afterwards, Petty dropped the defendant off at the defendant's truck shop and went to meet Inspector Penrod.  Petty arrived at the Home Depot in Algonquin at about 4:15 p.m.  He entered Inspector Penrod's vehicle and pulled out an "eight ball."  Petty was arrested.  According to Petty, it was the first time he had ever delivered narcotics to anyone.

After Petty was arrested he was brought to the police station and questioned.  Petty swore out an affidavit in the name of "John Doe" and was brought before a judge.  He was then given a personal recognizance bond.  Petty admitted that the State had agreed to dismiss a pending charge against him in exchange for his testimony.

Finally, Petty identified the affidavit that he signed, which resulted in the search warrant.  Petty testified that he verified to a judge that the contents of the affidavit were true.  Petty also identified his signature.

Ronald Nanstiel testified on behalf of the defendant that Petty was his roommate from May 2002 through June 2002.  Nanstiel charged Petty $100 per week for rent.  After Petty moved in, Nanstiel learned that Petty had a cocaine problem.  Petty would frequently bring big rocks of cocaine into the apartment.  Petty used cocaine in the apartment on a daily basis.  On one occasion when Petty did not have enough money for rent, 
Petty tried to pay Nanstiel with cocaine.  Petty displayed bizarre behavior while he was under the influence of cocaine.  Nanstiel never saw the defendant and Petty together.  Nanstiel evicted Petty from the apartment after Petty told him that he set the defendant up with cocaine.  On cross-examination, Nanstiel clarified that Petty never said that he planted the cocaine.

Geoff Knoezer testified on behalf of the defendant that the defendant and Petty are acquaintances of his.  He knows the defendant from playing pool at bars.  He also knows Petty from playing pool at bars.  Knoezer has in the past done computer work for the defendant.  In 2002, Knoezer installed track lighting in the master bedroom of the defendant's house.  Knoezer could not recall the exact days he worked on the track lighting.  He worked on two different days.  He worked 20 minutes the first day and 3 hours the next day.  On one of the days that Knoezer was working, he saw Petty at the defendant's house.  Petty was painting the master bathroom.  Knoezer admitted on cross-examination that he has used cannabis in the past and at one point in time had his driving privileges suspended.

The defendant testified that the master bedroom in his house was being remodeled in June 2002.  The defendant had hired various workmen to assist in the project.  The defendant hired Petty to finish the master bathroom.  He had met Petty three months prior at a bar called the Algonquin Roadhouse.  Petty was doing some paint and drywall work at the bar.  Prior to the defendant hiring Petty to work on his bathroom, Petty had come to the defendant's trucking company on at least three occasions seeking employment as a driver.  Petty did not have the requisite driver's license so the defendant did not hire him.

The defendant testified that on the morning of June 28, 2002, he packed his boat in preparation for an afternoon on the Fox River.  The defendant left for work about 7:30 a.m.  He worked until 3 or 4 p.m.  He and his wife then took the boat out and had dinner at one of restaurants on the river.  He returned home at approximately 8:30 p.m. but had to leave again around 11 p.m. because he received a call from one of his drivers regarding a truck that needed to be towed.  When he returned home, his house was in shambles and he discovered that police had charged him with drug possession.  According to the defendant, the cocaine found in his bedroom was Petty's.

On cross-examination, the State questioned the defendant regarding whether he contacted the towing company that had towed his truck about testifying as to his whereabouts on June 29, 2002.  The defendant replied that he had not.

After considering the above testimony, the jury found the defendant guilty of unlawful possession of cocaine and unlawful possession of cocaine with intent to deliver.  The trial court entered convictions consistent with the jury's verdict.  The trial court sentenced the defendant to 12 years' imprisonment and fined the defendant $52,800 on the unlawful possession with intent to deliver conviction.  Following the denial of his posttrial motions, the defendant filed a timely notice of appeal.

The defendant's first contention on appeal is that the trial court erred in denying his motion to suppress.  He argues that the trial court lacked probable cause to issue the search warrant because the warrant was based solely on information provided by Charles Petty.  He additionally argues that police improperly executed the search warrant by not complying with the knock-and-announce rule.

We first address the issue regarding probable cause to issue the search warrant.  For a search warrant to be valid, the complaint and supporting affidavit are not required to show beyond a reasonable doubt that the warrant should be issued; rather, they need only establish probable cause.  
People v. Stewart
, 104 Ill. 2d 463, 476-77 (1984).  A showing of probable cause means that the facts and circumstances within the knowledge of the affiant are sufficient to warrant a person of reasonable caution to believe that an offense has occurred and that evidence of it is at the place to be searched.  
People v. Free
, 94 Ill. 2d 378, 400 (1983); 
People v. Bauer
, 102 Ill. App. 3d 31, 37 (1981).  The judge asked to issue the search warrant may draw reasonable inferences from the material supplied in support of the complaint for search warrant.  
People v. Cooke
, 299 Ill. App. 3d 273, 278 (1998).  In judging probable cause, the issuing magistrate is not to be confined by narrow limitations or by restrictions on the use of his or her common sense; the magistrate's determination of probable cause should be paid great deference.  
People v. Gacy
, 103 Ill. 2d 1, 21 (1984).

In this case, we believe that the affidavits provided probable cause to issue the search warrant.  In his affidavit, Petty recounted specific events that he personally observed.  He recounted having purchased cocaine from the defendant in the defendant's house and having observed a large quantity of cocaine under a desk in the defendant's master bedroom.  Inspector Penrod's affidavit corroborated many aspects of Petty's affidavit.  As such, there was probable cause to issue the search warrant.

The defendant argues that probable cause should be found to be lacking where a confidential informant has no proven record of reliability.  We disagree.  Where the informant has appeared before the issuing judge, the informant is under oath, and the judge has had the opportunity to personally observe the demeanor of the informant and assess the informant's credibility, additional evidence relating to informant reliability is not necessary.  
People v. Hancock
, 301 Ill. App. 3d 786, 792 (1998); 
People v. Phillips
, 265 Ill. App. 3d 438, 448 (1994).

We next address whether the search warrant was executed properly.  The knock-and-announce rule provides that in executing a search warrant, police should knock and announce their authority so to allow a person sufficient opportunity to respond before a forcible entry is made.  
People v. Riddle
, 258 Ill. App. 3d 253, 258 (1994).  The knock-and-announce rule is intended to promote privacy and safeguard both residents and officers during the execution of arrest and search warrants. 
 
People v. Ouellette
, 78 Ill. 2d 511, 518 (1979).  There are no rigid rules for determining whether officers have allowed a sufficient period of time to elapse before entering a building to execute a search warrant.
  
People v. Kelver
, 258 Ill. App. 3d 153, 156 (1994).

Illinois has no statutory requirement that officers must knock and announce their authority, and the failure of police to do so is not a constitutional violation 
per
 
se
.  
People v. Saechao
, 129 Ill. 2d 522, 531 (1989).  However, compliance with the knock-and-announce rule is an important consideration in determining the reasonableness of police entry into a private dwelling to make an arrest or to conduct a search.  
Saechao
, 129 Ill. 2d at 531.  In certain instances, such as where there exist exigent circumstances or where compliance with the rule would be useless, police need not knock and announce their authority.  
People v. Condon
, 148 Ill. 2d 96, 102 (1992).

In this case, approximately 10 seconds elapsed between when the police announced themselves and when they broke open the defendant's door.  We believe that 10 seconds was sufficient here, given that a large amount of cocaine was possibly located inside the home and one or more residents were possibly present.  We note that several other reviewing courts have upheld searches where a similar amount of time was at issue.  See 
Kelver
, 258 Ill. App. 3d at 156 (search was reasonable where 10 seconds elapsed between the time police announced themselves and entered); see also 
People v. Cobb
, 97 Ill. 2d 465, 487 (1983) (search was reasonable where 15 seconds elapsed between the time police announced themselves and entered
); 
People v. Mathes
, 69 Ill. App. 3d 275, 279 (1979) (same).

The defendant's next contention on appeal is that he was not convicted beyond a reasonable doubt.  He argues that Petty's testimony was incredible and inconsistent, and the State offered no evidence to corroborate Petty's version of events.

It is not the function of the reviewing court to retry a defendant when considering a challenge to the sufficiency of the evidence.  
People v. Collins
, 106 Ill. 2d 237, 261 (1985).  A criminal conviction will not be set aside on the grounds of insufficient evidence unless the proof is so improbable or unsatisfactory that there remains reasonable doubt of the defendant's guilt.  
People v. Tye
, 141 Ill. 2d 1, 13 (1990).  The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Collins
, 106 Ill. 2d at 261.  The determination of the weight to be given to the witnesses' testimony, their credibility, and the reasonable inferences to be drawn from the evidence are the responsibility of the fact finder.  
People v. Steidl
, 142 Ill. 2d 204, 226 (1991); 
Collins
, 106 Ill. 2d at 261.

The crime of unlawful possession of cocaine with intent to deliver is defined as follows:

"§401.  Except as authorized by this Act, it is unlawful for any person knowingly to: (i) manufacture or deliver, or possess with intent to manufacture or deliver, a controlled or counterfeit substance ***."  720 ILCS 
570/401 (West 2002).

To support a charge of unlawful possession of a controlled substance with intent to deliver, the State must prove that (1) the defendant had knowledge of the presence of the narcotics; (2) the narcotics were in the defendant's immediate and exclusive control; and (3) the defendant intended to sell or deliver the narcotics. 
People v. Robinson
, 167 Ill. 2d 397, 407 (1995); 
People v. Cooper
, 337 Ill. App. 3d 106, 110-11 (2003).  The elements of knowledge, possession, and intent are questions of fact that are rarely susceptible to direct proof.  
Cooper
, 337 Ill. App. 3d at 110-11.

The accused's knowledge may be shown by evidence of his acts, declarations, or conduct from which the inference may be fairly drawn that he knew of the existence of the controlled substance at the place where it was found. 
 
Cooper
, 337 Ill. App. 3d at 110.  
Possession may be either actual or constructive.  
Cooper
, 337 Ill. App. 3d at 110. 
 Constructive possession exists where there is an intent and a capability to maintain control and dominion over the narcotics and may be proved by showing that the defendant controlled the premises where the narcotics were found.  
Cooper
, 337 Ill. App. 3d at 110. 
 Intent to deliver a controlled substance may be inferred from the amount of the substance possessed, where the amount could not reasonably be viewed as designed for personal consumption
.  
People v. Gonzalez
, 313 Ill. App. 3d 607, 616 (2000).

In this case, the State showed the requisite knowledge, possession, and intent.  Police testified to finding a large quantity of cocaine in the defendant's bedroom, under the bed and in a vanity.  Some of the cocaine was uncut and some had been divided into plastic baggies.  Police also found a scale.  Police were able to smell the cocaine upon entering the defendant's bedroom.  
Petty testified that he had observed the defendant's cocaine and had purchased some the day before the search warrant was executed.  Petty explained that he tipped police off to the defendant's cocaine after he got caught selling cocaine to the police.  Finally, Petty remained in custody until after the search warrant was executed.  
Viewing the above evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found that the defendant unlawfully possessed cocaine with the intent deliver.

Although the defendant's and his witnesses' version of events was much different from that of Petty, it was the prerogative of the jury to conclude that Petty's version was more credible.  See 
Tye
, 141 Ill. 2d at 13.  A verdict may not be lightly set aside merely because the trier of fact chose to believe the testimony presented by the State.  
People v. Abrams
, 109 Ill. App. 3d 901, 906 (1982).  Indeed, a conviction will not be reversed simply because the defendant tells the reviewing court that a witness was not credible.  
People v. Byron
, 164 Ill. 2d 279, 299 (1995).  In this case, the jury's acceptance of Petty's version of events was not so unreasonable.  The record reveals that the street value of the cocaine found in the defendant's house was $52,800.  It would be remarkable for Petty, who struggled to pay his $100-per-week rent, to obtain such a large quantity of cocaine and for 
such a large quantity of cocaine to go unnoticed in the defendant's bedroom.

Finally, the defendant contends that several trial errors deprived him of a fair trial.  The defendant argues that (1) the trial court erred in not granting him a continuance to prepare for Petty's testimony; (2) the trial court erred in precluding him from questioning Petty regarding a 1994 indictment for delivery of a controlled substance that was dismissed; (3) Petty's testimony that the defendant had sold him cocaine on 15 occasions was inadmissable other-crimes evidence; (4) the State erred in questioning Petty, and in commenting during closing argument, on the affidavit Petty signed; (5) the State improperly questioned him regarding why he did not assert an alibi; and (6) the State improperly vouched for the credibility of Petty during its rebuttal argument.

We address each of these arguments in turn, starting with the trial court's refusal to grant a continuance.  The basic principle involved on the issue of a request for a continuance is whether the attorney in a criminal case was given sufficient time to prepare for trial. 
 
People v. Canaday
, 49 Ill. 2d 416, 427 (1971).  What is a reasonable time for the preparation of a case and what time should be granted counsel for that purpose must necessarily depend upon the facts and circumstances of each case.  
People v. Gore
, 6 Ill. App. 3d 51, 55-56 (1972).  The period of time allowed need not be lengthy as long as it is sufficient to give an accused and his counsel an opportunity to prepare.  
Gore
, 6 Ill. App. 3d at 56.  
The 
question of whether the defendant's attorney was afforded ample time to prepare for trial rests within the discretion of the trial judge and the determinations of such trial judge should be upheld unless there is evidence of an abuse of such discretion.
  
People v. Thomas
, 176 Ill. App. 3d 514, 519 (1988).

In this case, the trial court did not abuse its discretion.  The record reveals that both the State and the defendant believed that Petty would be unavailable to testify as a witness at the trial, due to Petty asserting his constitutional right to remain silent.  However, on the second day of the trial, the State and Petty finalized a negotiated plea, which allowed Petty to testify.  When the State announced that Petty was to testify, the defendant objected, claiming that he needed more time to prepare and was unaware of what Petty might say on the stand.  The trial court declined to continue the case, but did recess for an extended lunch to allow the defendant to interview Petty.

We believe that the time granted by the trial court was sufficient. 
 The defendant had known for some time that Petty was the confidential informant and had known Petty's version of the events from the affidavit that Petty had signed.
  The extended lunch break allowed the defendant an opportunity to interview Petty and determine if his story had changed.  The defendant even had the foresight to call Ronald Nanstiel and Geoff Knoezer as witnesses to counter Petty's testimony.  Accordingly, the trial court did not err in granting a continuance.

We next address whether the trial court erred in precluding the defendant from questioning Petty about a 1994 indictment for delivery of cocaine that was dismissed.  The law on this issue is well settled.  A defendant may impeach a witness by attacking the witness's character with proof of a conviction of a crime that is punishable by death or imprisonment of one year or more or that involves dishonesty or false statements.  
People v. Pecoraro
, 175 Ill. 2d 294, 309 (1997).  However, only actual convictions may be used for this purpose.  
Pecoraro
, 175 Ill. 2d at 309. 
 Proof of arrests, indictments, charges, or the actual commission of a crime is not admissible.  
Pecoraro
, 175 Ill. 2d at 309. 
 As such, the trial court did not err in precluding the defendant from questioning Petty about the indictment.

Next, the defendant argues that the trial court improperly permitted Petty to testify that the defendant had sold him cocaine
 on 15 occasions.  The defendant has waived this contention because he did not contemporaneously object during trial.  See 
People v. Enoch
, 122 Ill. 2d 176, 186 (1988).  Even absent the waiver, there was no error.  The defendant's objection likely would have been overruled.

The general rule is that evidence of crimes other than those charged is inadmissible.  
People v. Donoho
, 204 Ill. 2d 159, 170 (2003).  This general rule is premised on the belief that such evidence overpersuades the jury, which might convict the defendant only because it feels he or she is a bad person deserving of punishment.  
People v. Lindgren
, 79 Ill. 2d 129, 137 (1980).  However, evidence of other crimes is admissible to demonstrate anything other than a propensity to commit crime, including:

"[A]mong other things, 
modus
 
operandi
, motive, knowledge, intent, absence of mistake or accident, defendant's state of mind, absence of an innocent mind frame or the presence of criminal intent, circumstances or context of defendant's arrest, placement of defendant in proximity to the time and place of the crime, identification of the weapon used in a crime, consciousness of guilt, to show a common design, scheme or plan, circumstances of a crime charged that would otherwise be unclear, whether a crime charged was actually committed, opportunity or preparation, a defendant's dislike or attitude toward the victim, to explain an otherwise implausible fact relating to the crime charged, to contradict on rebuttal a defendant's denials, to disprove a defense of entrapment and to disprove an alibi defense."  
People v. Millighan
, 265 Ill. App. 3d 967, 972-73 (1994).

Petty's testimony here was relevant to show that the defendant knowingly possessed the drugs inside of his house.  We note that in 
People v. Cole
, 29 Ill. 2d 501, 504 (1963), the supreme court upheld similar evidence concerning a defendant's prior narcotics transactions, reasoning that it was relevant to show the defendant's guilty knowledge.

The defendant next argues that the State erred in questioning Petty about and in commenting on the affidavit.  He argues that the affidavit constituted an inadmissable prior consistent statement.  Again, the defendant has waived this argument because he did not object at the trial.  See 
Enoch
, 122 Ill. 2d at 186.  Nonetheless, we disagree with defendant. 
 Generally, prior consistent statements are permitted solely for rehabilitative purposes and not as substantive evidence.  
People v. Lambert
, 288 Ill. App. 3d 450, 457 (1997). 
 In this case, we do not believe that a prior consistent statement was allowed.

During the questioning of Petty, the following colloquy took place regarding the affidavit:

"ASSISTANT STATE'S ATTORNEY BEADERSTADT: I'm going to show you People's exhibit 13.  Do you recognize what that is?

PETTY: Yes, I do.

ASSISTANT STATE'S ATTORNEY BEADERSTADT: 
What is it?

PETTY: That's the affidavit I signed in front of the judge.

ASSISTANT STATE'S ATTORNEY BEADERSTADT: 
Okay.  Is it a fair and accurate copy of that affidavit you certified in front of the court?

PETTY: Yes, I did.

ASSISTANT STATE'S ATTORNEY BEADERSTADT: 
Is that your signature on the signature line?

PETTY: The John Doe?

ASSISTANT STATE'S ATTORNEY BEADERSTADT:
 Yes.

PETTY: Yes.

ASSISTANT STATE'S ATTORNEY BEADERSTADT:
 You signed that?

PETTY: Yes, I did."

During closing argument, Assistant State's Attorney Beaderstadt stated as follows:

"[Petty] told Judge Condon in this case what he believed the facts were.  And he told him in that sworn statement, in that sworn affidavit that he received those drugs from [the defendant] at the house of 371 Cornell Drive in Algonquin."

As is clear, there was no prior consistent statement admitted.  The affidavit itself was not admitted.  Petty was merely questioned about it, without objection from the defendant, and the State made only brief mention of it during its closing statement.

Last, we address the defendant's final arguments concerning prosecutorial misconduct. 
 The defendant contends that the State improperly questioned him regarding why he did not have an alibi the night that the search of his house was conducted.  Although we believe that the State's line of questioning was improper, we do not believe that the defendant was prejudiced.  Alibi was not a defense to the crime for which the defendant was charged.  The defendant's whereabouts the night the warrant was executed were inconsequential in this case.

The defendant also contends that the State improperly vouched for the credibility of Petty.  The defendant cites to the following passage from the State's rebuttal argument:

"Why would we want to go through the expense of having a trial, putting police officers on who have years of experience, years of dedication, years of a career to flush all that down the toilet to prosecute two innocent people[?]"

Nothing in this passage resembles vouching for the credibility of a witness.  In sum, we find the defendant's claims of prosecutorial misconduct to be meritless.

For the foregoing reasons, the judgment of the circuit court of McHenry County is affirmed.

Affirmed.

O'MALLEY, P.J., and HUTCHINSON, J., concur.