# Illinois Official Reports

## Appellate Court

---

### *People v. Cerda*, **2014 IL App (1st) 120484**

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JESUS CERDA, Defendant-Appellant. |
| District & No. | First District, Fifth Division<br>Docket No. 1-12-0484 |
| Filed | March 7, 2014 |
| Rehearing denied | March 20, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from defendant's convictions and consecutive sentences for criminal sexual assault of his stepdaughter, the appellate court rejected his contentions that the complainant's testimony and the other crimes evidence were inherently unbelievable, that his right to present a defense and confront witnesses against him was violated by the exclusion of evidence pursuant to the rape shield statute and that the trial court erred in admitting evidence of uncharged assaults against the complainant and other stepdaughters, since the complainant was cross-examined thoroughly, the jury had the opportunity to see and hear her testimony, observe her demeanor, and resolve any disputes about her credibility, as well as the credibility of her mother and the other witnesses, the admission of the evidence of other crimes was not an abuse of discretion and there was no violation of the rape shield statute. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CR-18692; the Hon. Michael Brown, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael J. Pelletier, Alan D. Goldberg, and Sarah Curry, all of State Appellate Defender's Office, of Chicago, for appellant.

Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Mary L. Boland, and Carol Rogala, Assistant State's Attorneys, of counsel), for the People.

Panel

PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.
Justices McBride and Taylor concurred in the judgment and opinion.

## OPINION

¶ 1    Defendant Jesus Cerda was convicted on December 1, 2011, after a jury trial of four counts of criminal sexual assault of his stepdaughter J.M. that occurred between March 1, 2006, and January 31, 2007. After hearing factors in aggravation and mitigation, the trial court sentenced defendant to four consecutive terms of 10 years, for a total of 40 years in the Illinois Department of Corrections (IDOC).

¶ 2    On this direct appeal, defendant raises three issues for our consideration: (1) that the State failed to prove him guilty beyond a reasonable doubt because both the complainant's testimony and the other crimes evidence were inherently unbelievable; (2) that the trial court violated defendant's right to present a defense and confront the witnesses against him by excluding evidence, pursuant to the rape shield statute (725 ILCS 5/115-7(a)(2) (West 2006)), concerning the victim's past sexual experience; and (3) that the trial court erred by allowing the State to introduce evidence of other sexual assaults committed by defendant against both J.M. and another stepdaughter. For the following reasons, we do not find these claims persuasive and we affirm.

¶ 3                          BACKGROUND
¶ 4                      I. Procedural History
¶ 5    Defendant was charged on October 19, 2009, in two separate indictments with offenses against his then-teenage stepdaughter, J.M. The indictment in case number 09 CR 18693 charged defendant with two counts of criminal sexual assault between November 1 and November 30, 2005. However, defendant was not tried on this indictment.

¶ 6    The State proceeded solely with the indictment in case number 09 CR 18692, which charged defendant with six counts of criminal sexual assault and one count of aggravated sexual abuse for acts committed against J.M. between March 1, 2006, and January 31, 2007. Prior to defendant's first trial, the State nol-prossed count VII, the one abuse count, and

- 2 -

proceeded to trial on the remaining six counts. Prior to submitting the case to the jury, the State nol-prossed count VI, which had alleged criminal sexual assault by means of defendant inserting his finger into J.M.'s vagina.

¶ 7 On September 16, 2011, the first jury acquitted defendant of count V, which had alleged criminal sexual assault by means of contact between defendant's mouth and J.M.'s vagina. However, the jury was unable to reach a verdict on the remaining counts, which were counts I through IV. The trial court then entered judgment on the acquittal for count V and declared a mistrial on counts I through IV.

¶ 8 After a retrial, a second jury found defendant guilty on December 1, 2011, on counts I through IV, which all charged criminal sexual assault of J.M. After hearing factors in mitigation and aggravation, the trial court sentenced defendant on January 25, 2012, to 10 years on each count, with all sentences running consecutively.

¶ 9 II. Pretrial Motions

¶ 10 Defendant contests on this appeal three of the trial court's pretrial rulings. Specifically, he challenges the rulings which (1) granted the State's motion to present other crimes evidence; (2) denied defendant's motion to present evidence concerning the victim's prior sexual and romantic history; and (3) denied defendant's oral motion "to inquire of the victim as to what she told her mother on or just prior to her outcry" concerning her first sexual experience "with a boy her own age." The first two rulings occurred prior to the first trial and the trial court declared them in effect for the second trial. The third ruling occurred prior to the start of the second trial. Since we must decide whether the trial court abused its discretion in ruling on the motions, we provide in detail below the parties' arguments and the trial court's rulings.

¶ 11 A. Other Crimes Evidence

¶ 12 Prior to defendant's first trial, the State filed a written motion, pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-7.3 (West 2006)), to admit proof of other crimes by defendant. This statutory section applies solely to prosecutions for sex offenses, and it permits the State to introduce evidence of other sex offenses by a defendant, if the probative value of the evidence outweighs the undue prejudice to the defendant. 725 ILCS 5/115-7.3(c) (West 2006).

¶ 13 In the case at bar, the State sought to introduce evidence of crimes that had been charged in two other indictments: (1) the indictment in case number 09 CR 18693, described above, which charged defendant with criminal sexual assault against J.M. in November 2005, several months *before* the acts charged in the case at bar; and (2) the indictment in case number 09 CR 18691, which charged defendant with eight counts of aggravated sexual abuse against Y.C., another stepdaughter, between February 1, 2008, and August 31, 2009.[1] The offenses against Y.C. occurred more than a year *after* the acts charged in the case at bar.

¶ 14 In its written motion filed November 3, 2010, the State argued:

"The other crimes acts are factually similar to those of the case at bar in that [they] are sexual acts against minor stepchildren with whom defendant resided and which

---

[1]The indictment concerning Y.C. is not in the appellate record but it is described in the State's motion.

- 3 -

occurred when the children's mother was out of the home. The acts' temporal proximity and factual similarity demonstrates a probative value on the relevant issues of propensity, intent, motive and absence of mistake which outweighs their potential prejudice."

In response, defendant argued that the evidence was not reliable. Defendant also observed that "J.M.'s allegations are not admissible on the issue of intent and/or absence of mistake" because defendant's "defense is based on the proposition that the alleged contact never occurred."

¶ 15    After hearing argument on January 14, 2011, the trial court ruled the evidence admissible, and that ruling is the subject of one of defendant's claims on this appeal. At the start of the trial, on September 13, 2011, defense counsel asked his "objection to the proof of other crimes, for the record, continue throughout this trial," in order to avoid "excessive sidebars," and the trial court agreed.

¶ 16                              B. Rape Shield Statute

¶ 17    Prior to the start of the first trial, both parties also filed written pretrial motions concerning the rape shield statute: (1) defendant moved to admit evidence, as not barred by the statute, of the victim's past relationship with S.B.; and (2) the State moved, pursuant to the statute, to bar DNA evidence establishing that defendant was not the source of semen stains found on the victim's bedsheets. As described below, the trial court denied both motions, thereby denying defendant the ability to cross-examine the victim and S.B. about their prior sexual or romantic past, but allowing him to introduce DNA evidence that he was not the source of the semen stains left on the victim's bedsheets.

¶ 18                              1. Relationship With S.B.
¶ 19                              a. Parties' Arguments
¶ 20    With respect to S.B., defendant moved in a pretrial motion filed September 12, 2012, "to admit evidence of, or allow inquiry as to, the nature of the alleged victim's past and/or present relationship with the State's witness, [S.B.], for the limited purpose of establishing [her] bias." At a hearing on the motion on September 12, 2011, defense counsel asked "to inquire as to simply the relationship between State's witness, [S.B.], and the alleged victim." Specifically, he sought to ask: "[W]hat is your relationship to this victim now? What was your relationship in 2007[?]" He argued that the evidence was not "in violation of [the] rape shield" statute because the defense was "not here trying to put the victim's sexual identity or preference on trial," but to explore "a potential bias for her testimony."

¶ 21    In response, the State argued, first, that defendant failed to offer any evidence in his offer of proof. Second, the State argued that, since the romantic relationship began after the first outcry in 2005 and ended before 2007 when law enforcement first became aware of the outcry, the relationship had less relevance. Third, the State argued that "the mere fact that these 2 individuals were dating" still fell within the scope of the rape shield statute.

¶ 22                              b. Trial Court's Ruling
¶ 23                              i. Sexual or Romantic Past Not Admitted

¶ 24    The trial court held that it would "not allow her testimony concerning a sexual or romantic past between [S.B.] and the victim," explaining:

> "You may identify and establish what their relationship was at the time of these occurrences and the jury can determine whether or not there was be a bias [*sic*], but I do think it would be prejudicial even in the 21st Century that we have to put in information or testimony about a same sex relationship. It does not appear to have anything to do with the charges filed against the defendant, and I think it would be inflammatory, and I don't see that it would advance the defendant's right for cross-examination ***."

¶ 25    The following day, on September 13, 2011, the trial court clarified its ruling, stating:

> "Counsel, just so the record is clear, although it should reflect on yesterday's proceedings that I denied the motion as it relates to a sexual past, sexual relationship between [J.M.] and [S.B.] But I did not allow for testimony as to their general relationship and that you would be able to ask leading questions so as not to elicit testimony concerning a romantic relationship or sexual past between [J.M.] and [S.B.]"

The trial court later added:

> "I think that [S.B.] can be cross-examined specifically about her relationship with the victim in this matter as long as it does not cross into a prohibited area, of which is the romantic and/or sexual relationship that according to the information that I have took place sometime after the alleged act, but before the charges [were] brought."

## ii. Offer of Proof Not Required

¶ 26

¶ 27    After the trial court's above clarification on September 13, 2011, the prosecutor then asked if the trial court was considering hearing testimony on this issue in order "to satisfy the offer of proof which is required under section B of the Rape Shield Act." The trial judge replied that he did not "need to hear the testimony of the victims about the relationship because I find that [it] does not qualify as an exception to the statute as a matter of law."

## 2. DNA Evidence

¶ 28

¶ 29    The State also filed a written motion on September 12, 2011, pursuant to the rape shield statute, to bar DNA evidence of five separate semen stains found on the victim's bedsheets. None of the stains matched defendant's DNA profile. The trial court denied the motion, stating:

> "The question becomes this[:] to what extent will I allow the evidence as an exception to the Rape Shield Act? If the victim indicates that in her testimony that she had sex with another man during that period of time at that location, then I will only allow a stipulation indicating that there was testing done of the bedsheets that the–that there was a male profile and the male profile did not match the defendant ***."

However, if the victim denied having sex with another male, then the trial court would "expand [its] ruling" to allow forensic testimony about the collection, testing and analysis of the DNA evidence.

## C. Pretrial Rulings Prior to Second Trial

¶ 30

¶ 31    Prior to the second trial, the trial court stated: "Unless either side wants to revisit the motions *in limine* and give me a reason why I should disturb my earlier rulings, those rulings

will be in effect." Defense counsel then, "for the record[,] renew[ed] all outstanding or previous objections to proofs of other crimes," and the trial court stated that "for purposes of any appeal *** the matter would be preserved."

¶ 32　　Also immediately before the start of the second trial, defendant orally made a new motion to be allowed "to inquire of the victim as to what she told her mother on or just prior to her outcry" concerning her first sexual experience "with a boy her own age." Since the State argues on appeal that the defense made an insufficient offer of proof to support this motion, we provide, in full, counsel's oral statement of defendant's offer of proof:

> "According to the Burnham Police reports, the detectives met with her at the Burnham Police Department in 2007, [and] she related to the detectives that two years ago, which would have been 2005, her stepdad began to touch her; the officers asked her to identify her parts, which she did, and then according to the report she states[:] 'She stated that she told her mom days before about having had sex for the first time with a boy her age,' and I would ask the Court for leave to inquire of this witness-victim as to her motives for her outcry in such close proximity to her having admitted to her mom for the first time having sex with a boy her age.
>
> It's alleged that my client started touching her. It says[:] 'According to the victim[,] shortly after that was when the touching started.' So shortly after the time when she first had sex with a boy her age[,] my client's [*sic*] alleged to have molested her. And with that, Judge, I'd rest in argument allowing us in observance of the Rape Shield Law to inquire of the victim as to these facts or motives in her out cry."

The defense did not offer a copy of the police report, which it had quoted from. In response, the State objected to admission of this evidence as violating the rape shield statute, but it did not object to the adequacy of defendant's offer of proof.

¶ 33　　After hearing argument from both sides, the trial court issued the following ruling:

> "I had indicated in the first trial that the information that the victim did have sex with another person was vital to the defendant's defense, it was constitutionally permitted as an exception to the Rape Shield Laws as we know it and I think that's still the same. I think the defendant is entitled to put out that [*sic*] during this period of time there was DNA that was recovered from the bed sheet which did not match the defendant and I indicated in that motion *in limine* that if the victim denied having sex with another person on that bed that I would expand the scope of the inquiry to allow the defense to delve into it but the victim admitted having sex with another person during that period of time.
>
> That's as far as we're going to go. I think that's as far as we're going to go now. Her motive to outcry to the Burnham police and what she may have told someone shortly before the outcry I think does not go to the exception in the Rape Shield Law. It's not constitutionally required."

¶ 34　　　　　　　　　　　　　　III. Evidence at Second Trial

¶ 35　　At trial, the State called six witnesses, including: (1) J.M. and (2) Y.C., the two stepdaughters abused by defendant; (3) their mother; (4) S.B., the friend to whom J.M. first disclosed the abuse; (5) C.M., J.M.'s aunt and the first adult to whom J.M. made an outcry; and (6) the doctor who examined J.M. The defense called four witnesses, including: (1)

defendant's neighbor; (2) defendant's 16-year-old niece; (3) defendant's sister; and (4) defendant.

¶ 36 Since we are called upon in this appeal to decide the sufficiency of the evidence in a case without any corroborating physical evidence or admissions by defendant to the police, and where the DNA evidence points to another male, we provide the full particulars of the testimony, below. The State's evidence is in the details which form an interlocking pattern. Each pass through the testimony, on direct, cross and redirect, uncovers more corroborating information and thus supports the State's case more thoroughly than if it had been told in one rehearsed narrative on direct examination.

¶ 37                                     A. The Victim, J.M.
¶ 38                                     1. Direct Examination
¶ 39 J.M., who was 20 years old at the time of the second trial, testified that she was currently the assistant manager at a Family Dollar store and lived outside of the Chicago area. She used to live in a single-family house with her mother, brother and two sisters in Burnham, a southern suburb of Chicago. Prior to February 2007, defendant, who was her stepfather, also lived in the house. She first met defendant when she was eight years old.

¶ 40 The first high school she attended was Fountain Valley, a boarding school in Colorado, which she received a scholarship to attend. In 2005, when she began her freshman year at Fountain Valley, her family was living in South Dearing, a neighborhood in Chicago, and her family included her mother, her siblings and defendant. She was the oldest child; and her sisters Y.C. and A.C. were 5 and 10 years younger, respectively.

¶ 41 In November 2005, during her freshman year at Fountain Valley, she came home for Thanksgiving break to the house in South Dearing. But by the time she came home for spring break in 2006, her family had moved to Burnham. At the end of summer break in 2006, she returned to Fountain Valley for the start of her sophomore year. However, she was only at Fountain Valley for a couple of weeks during her sophomore year before she returned to Burnham and enrolled at a local school.

¶ 42 In the Burnham home, which was a single-family house, there were three bedrooms on the first floor and a bedroom in a finished basement. In addition to the bedroom, which was J.M.'s bedroom, the basement also contained a laundry room and a computer room. J.M. did not share her bedroom with her other siblings. Her mother worked outside the home as a correctional officer and sometimes worked nights. When her mother worked nights, she sometimes slept during the day. In 2006, defendant was not employed outside the home, so there would be times when defendant was home with J.M. or her siblings and their mother was at work.

¶ 43 During the school's spring break in 2006, defendant entered J.M.'s bedroom when no one else was in the basement and "rubbed all over" her and "tried to make [her] suck his penis." At this time, she was 15 years old. Defendant "kept forcing [her] mouth to touch his penis." During spring break, defendant had sex with her more than once but she does not remember exactly how many times. His penis contacted both her vagina and her mouth, and it entered her vagina. When spring break ended, she returned to Fountain Valley and finished her freshman year in Colorado.

¶ 44 At the end of her freshman year, she returned to Burnham and, during the summer, defendant again had sex with J.M. in her bedroom. Specifically his penis entered her vagina

and also made contact with her mouth. She testified that: "It happened over and over again." At the end of the summer, she returned to Colorado to start her sophomore year of high school but she returned after just two weeks. She wanted to come home "[b]ecause [she] was afraid [that] what he was doing to [her] he was going to do to [her] sister." J.M.'s sister Y.C. was only 10 years old in 2006 and her sister A.C. was only 5 years old.

¶ 45 When J.M. returned, she enrolled at a local school and, during the fall and winter of 2006, the sex continued. By sex, she meant that his penis would be inserted into her vagina. It always occurred in her bedroom and when no one else was in the basement. There was a television in the basement, and defendant would watch porn and start masturbating. She did not recall how often the sex happened but it happened "a lot."

¶ 46 In January 2007, the sex changed, in that defendant had anal sex with her. Specifically, she testified that he inserted his penis into her "butt." This happened just once. J.M. never saw defendant ejaculate on her bed or on her bedsheets. He would "ejaculate in the shirt or the underwear, whatever was closest to him," and then take his clothes into the bathroom and leave.

¶ 47 After the anal sex, J.M. ran away, first to a friend's house and then to her aunt C.M.'s house. J.M. went to her aunt's house because her mother told her that she had to either go home or stay with a family member. J.M. stayed at her aunt's house for a couple of weeks until her mother sent "some cops to [her] aunt's house to come get [her]." After J.M. went home, the next day her mother and defendant drove her to a hospital in Indiana to see a therapist. Afterwards, they drove her back home. When they arrived back home, her mother was going to Wal-Mart and J.M. asked to go with her because there was something J.M. needed to tell her. During the vehicle ride, J.M. told her mother what defendant had been doing to her and they then went to the Burnham police station.

¶ 48 Spring break of 2006 was not the first time that anything happened with defendant. During Thanksgiving break in 2005, when her family was still in the house in South Dearing, J.M. had a series of telephone conversations with S.B., whom she knew from school. During one telephone conversation with S.B., J.M. was in her bedroom and defendant:

> "came in and started trying to force his tongue down my throat and pushing on me. And I kept trying to push him off and tell him no. At that point, he's two hundred and fifty pounds. He's on top of me."

J.M. was then only 14 years old, and defendant had sex with her. It was at night, and her mother was at work. When defendant forced himself on top of her, she tossed the telephone aside. After defendant stopped, he walked out and then walked back in. J.M. said she was going to tell her mother, and he kept saying that he was sorry and that he would never do it again. J.M. then called S.B. and told her that defendant had raped her.

¶ 49 Prior to Thanksgiving of 2005, defendant had expressed a sexual interest toward J.M. by trying to pull off her towel to see her breasts or lift up her skirt. This happened on more than one occasion. He would also try to grab her breasts when she walked by, or comment on their size, or "smack [her] butt."

¶ 50 Before J.M. told her mother in January 2007 what was happening, she had not told anyone else in her family except her aunt. She told her aunt when she ran away and ended up at her aunt's house. J.M. explained that she did not tell anyone because "[she] was scared. Because [she] didn't know what [defendant] was capable of doing to her." She finally told her mother in

January 2007 "[b]ecause everybody kept thinking that I was the one that was the problem. That I was just acting out, when really it was because of him. And [I] didn't want to be the one to blame anymore." Also, J.M. believed that "[i]f [she] said something, [her] mom wouldn't have nothing."

¶ 51    J.M. told her aunt because defendant had come by her aunt's house and given J.M. some money. Her aunt stated that, if J.M. did not tell her mother, then she would.

¶ 52                              2. Cross-Examination

¶ 53    On cross-examination, J.M. testified that defendant brought her money because she asked him to, because she needed money while living at her aunt's house. J.M. did not call her mother because she and her mother were not speaking at that time. J.M. told her mother about what defendant was doing because her aunt gave her an ultimatum.

¶ 54    On cross, J.M. testified that defendant had sex with her every time she came home from Colorado, including over the Christmas 2005 break. She never told her sister Y.C. what happened. When asked whether she told anyone about the sex over the Christmas 2005 break, she replied: "I have stated it happened for a year and a half of my life. Every time I came home. For the whole summer. I'm not going to remember every single time to tell them."

¶ 55    On cross, J.M. testified that, during the 2006 spring break, the penis-to-vagina sex occurred before the oral sex. As for the 2005 Thanksgiving break, she did not recall whether the first sex act occurred before or after Thanksgiving day. When he forced himself on her, she cried out "Stop" and tried "to push a two hundred and fifty pound man off" of her. J.M. did not say anything to try to obtain S.B.'s attention because S.B. was in another state. J.M. did not scream, and her mother was at work and thus not in the house. After defendant left the room, J.M. called S.B. and defendant returned. He may have heard her crying. She did not remember how much time elapsed between when defendant assaulted her and she called S.B. because she was "hysterical." When J.M. returned to Colorado after the Thanksgiving 2005 break, she did not tell anyone what happened, even though she felt safe there.

¶ 56    On cross, J.M. testified that she met S.B. through the boarding school's "Big Sib" program where the school paired up a freshman with an upperclassman. After the Thanksgiving 2005 break, J.M. asked to come home for Christmas and for the 2006 spring break. During her freshman year, she received good grades, participated in activities and was not disciplined for any reason. When she came home for the summer, she did not warn her sisters because "[t]hey were ten and five at the time. What was [she] going to tell them." She came home then for the sole purpose of protecting them. There were times during the Thanksgiving and Christmas 2005 breaks and the spring and summer 2006 breaks when she left her sisters at home in defendant's company.

¶ 57    On cross, J.M. testified that, in January 2007 when she ran away from home, she did tell a friend what happened. J.M. ran away because she was arguing a lot with her mother, who accused her of "being rebellious." When J.M. left the boarding school and returned to school in Chicago, she stopped playing sports. J.M. and her mother fought "all the time." She did not recall how many times during the 2006 summer defendant had sex with her, but it was a couple of times a week.

¶ 58    On cross, J.M. testified that, after she returned to Colorado to start her sophomore year, she begged to come home. After she came home, from the fall of 2006 through January 2007, the

sex happened "every week." When the anal sex occurred in January 2007, that was "[t]he one where [she] finally said [she] had enough" and ran away from home. She ran away within a couple of days. J.M. admitted that she had sex in that same bed with someone other than defendant in January 2007. That person was a boy her own age, and she does not know whether or not he ejaculated. The sex with a boy her own age occurred before the anal sex with defendant. After J.M. told the police in January 2007 about what happened, the police came to her home and obtained her bedsheets.

¶ 59 On cross, J.M. testified that, in January 2007, she and her mother were fighting about J.M.'s use of cannabis and about how J.M. spent her time with her friends outside of school. J.M.'s mother had grounded her and taken away her cell phone and, at the time when J.M. ran away from home, J.M. and her mother were not on speaking terms.

¶ 60 On cross, J.M. testified that the anal sex in January 2007 lasted a couple of minutes and it hurt her. After she ran away to a friend's house, her mother sent defendant to the friend's house and told J.M. that she had to go home or go to a family member. J.M. refused to go with defendant and then her aunt came and picked her up.

¶ 61 On cross, J.M. testified that, after her parents took her to the hospital in January 2007 to see a therapist for being rebellious, her mother grounded her and she asked if she could go to an auto show with defendant. She went with defendant, and without her mother, because she planned on telling her mother later and she did not want him to "suspect I was going to tell her." At the hospital, she was asked if anyone was molesting her, but "[w]hat was [she] supposed to say when he's sitting in the room." J.M. told her mother, after the auto show, when they were in the vehicle heading toward Wal-Mart. After J.M. told her, they never went to Wal-Mart and went straight to the police station instead.

¶ 62 On cross, J.M. testified that, after her outcry about the sex abuse, she left the Burnham house and went to live for a couple of years with her grandparents, who lived in another city in Illinois. A couple of months after she moved, she learned that her mother allowed her younger sisters to visit and stay with defendant. During the two years that she lived with her grandparents, she came back to Chicago only once.

¶ 63 On cross, J.M. testified that she "tried to come back to [her] Mom's house," during the summer but she did not remember whether it was 2009. Even though her mother allowed J.M. to move back to the Burnham house, she did not move then because she was "uncomfortable with the defendant still seeing [her] sisters." J.M. then explained to her sister Y.C. that she was not staying because of what defendant had done. When J.M. told Y.C. about what defendant had done, Y.C. started crying and they had a conversation. Her mother did not let defendant visit her sisters after that point.

¶ 64                                             3. Redirect/Recross

¶ 65 On redirect, J.M. testified that defendant and her mother married in 2000, and defendant was her stepfather for five years before any abuse began. During these five years, she had a good relationship with him, he took her to school and he never disciplined her. When she left the boarding school and enrolled in a local school, that is when she began to cut class, smoke marijuana and generally misbehave. At this time, she and her mother were fighting fairly regularly. Defendant did not try to abuse her outside of the family home, such as in a vehicle.

¶ 66     J.M. testified that, after the first act of sexual abuse during the Thanksgiving 2005 break, she was "hysterical" and crying. There were some points about what happened after that she cannot remember. When she returned after Thanksgiving to the boarding school, she did not tell anyone about what had happened because she was scared.

¶ 67     On recross, J.M. testified that there was not one specific sex act during the summer of 2006 that stood out in her memory because defendant tried to have sex with her two or three times a week. She could not recall whether he had sex with her on Memorial Day, the Fourth of July or Labor Day. She explained: "When it occurred so often, you don't remember every date. Especially when you are trying to forget something like that." All the sex occurred in her bed.

¶ 68                           B. The Victim's Friend, S.B.

¶ 69     The State's next witness was S.B., the boarding school friend with whom J.M. spoke on the phone in 2005 about the first act of sexual abuse. S.B. testified that she was 23 years old and living in another state where she attended school. She went to high school at the Fountain Valley School in Colorado, which is the co-ed private boarding school that J.M. also attended. During the 2005-06 academic year, S.B. was a junior in high school, and she met J.M. in the fall through the "Big Sib, Little Sib" program in which upperclassmen are paired with incoming students.

¶ 70     S.B. testified that neither she nor J.M. stayed at school during the 2005 Thanksgiving break. The entire campus closed for that week, and no one could stay at school then. By Thanksgiving, S.B. had known J.M. for about three months and they spoke on the phone several times during the break. There was one day when the conversations were unusual. On that day, S.B. was waiting for J.M. to call about a paper that was due at midnight in one of J.M.'s classes. Because of the paper, they had been speaking a lot that day. When J.M. called, she was crying frantically and she said that her "step dad" had raped her. At first, S.B. could not understand what J.M. was saying and it took a while for S.B. to calm J.M. down, so J.M. could relate what happened. J.M. was hysterical. During the conversation, S.B. heard a man calling out J.M.'s name and saying he was sorry. The two girls had subsequent conversations during that vacation week and also when they returned to school. J.M. asked S.B. not to tell anyone and S.B. did not. During S.B.'s senior year and J.M.'s sophomore year, J.M. left the boarding school and the two girls did not maintain contact.

¶ 71     On cross, S.B. testified that S.B. never visited J.M. in Chicago while they were in school together. The State's Attorney's office flew S.B. to Chicago to testify today and it had flown her to Chicago once before. The last time S.B. was in Chicago, she visited J.M.'s home but they did not discuss the specifics of the case.

¶ 72     On cross, S.B. testified that J.M. did not submit the paper on time that was due during the 2005 Thanksgiving break. When J.M. called frantically crying, it was in the evening and closer to the deadline. J.M. had made revisions and was working on the final paragraphs. It was an English paper. After the "crying phone calls," there were other phone calls "that struck [S.B.] as unusual." S.B. had been paired by the school with J.M. after the head of the Spanish department, who was also S.B.'s advisor, suggested that S.B. pair up with one of the female Spanish-speaking Latino students who was new to the school and so S.B. picked J.M. off a list.

¶ 73     On cross, S.B. testified that she did not speak with the police about J.M.'s outcry until 2007. At that time a person who presented himself as a police officer in Chicago called the

- 11 -

school and the school called S.B. to the Dean's office, where S.B. spoke to someone over the telephone whom she believed to be a police officer. One of the deans was present for the conversation. Prior to the call, all S.B. was told was that she "was being called by the police department in Chicago." S.B. met defendant in person in April 2006, a few months after the Thanksgiving phone call.

¶ 74 On cross, S.B. testified that she heard a male voice toward the end of the frantic phone call "because then the phone got cut off." S.B. heard from J.M. again that day but she could not recall how much time elapsed after the phone was cut off. S.B. did not recall the name of the officer who called the school but she did remember that he worked for the Burnham police. When the Burnham police officer called the school, she believed that she did tell him about the disconnection. There was more than one call that was disconnected. S.B. does not recall whether it was before or after J.M. told her that her stepfather forced himself on J.M. that S.B. heard the male voice say that he was sorry.

¶ 75 On cross, S.B. testified that she heard J.M. yelling at her stepfather to get out. S.B. then reviewed the police report to refresh her recollection about whether she had stated this to the police officer years ago. After reviewing the report, she testified that she told the officer that she was on the phone with J.M. during the 2005 Thanksgiving break when S.B. heard a male voice come close to the phone and then the victim disconnected the call. She also told the officer that, approximately 20 minutes later, after the phone call was disconnected, J.M. called S.B. back crying and at that time J.M. told S.B. that her stepfather has just forced sex on her and S.B. again heard the male voice. S.B. told the officer that, during this second call, she heard the male voice talking to the victim and apologizing. However, S.B. did not tell the officer about J.M. yelling at her stepfather.

¶ 76 C. The Victim's Mother, P.W.

¶ 77 P.W., the victim's mother, testified that she was 38 years old and a correctional officer for the Cook County sheriff's department, where she had worked for seven years. She is currently divorced, having divorced defendant in 2007. They married in April 2000. For the past six years, she has lived in a single-family house in Burnham, a southern suburb of Chicago. Prior to Burnham, she resided in the South Dearing neighborhood of Chicago. She has one son and three daughters. The daughters are: J.M., age 20; Y.C., age 15; and A.C., age 10. All of her children currently reside with her, except for J.M.

¶ 78 P.W. testified that the first high school that J.M. attended was Fountain Valley, a college prep boarding school in Colorado, which J.M. attended on an academic scholarship. When J.M. started her freshman year in 2005, the family was then living in South Dearing. When J.M. started high school, their relationship was good and J.M. was a great student. During J.M.'s freshman year at Fountain Valley, she came home for school breaks, including the Thanksgiving break in 2005 and the spring and summer breaks in 2006.

¶ 79 P.W. testified that, during J.M.'s freshman year, P.W. was employed as a corrections officer and defendant was not employed outside the home. As a result, there were times when J.M. came home on school breaks when P.W. was out of the house and defendant was at home. From the fall of 2005 through January 2007, P.W. was working the midnight shift, from 11 p.m. until 7 a.m.

¶ 80    P.W. testified that, at the end of the 2006 summer break, J.M. returned to Fountain Valley in Colorado to start her sophomore year, but she did not stay there. P.W. went to Colorado, and J.M. stated that she wanted to go home. After P.W. brought J.M. home, J.M. enrolled in a local Chicago school which she attended during the fall of 2006 and the winter of 2007. In January 2007, J.M. ran away from home and stayed with a friend. P.W. contacted the police, who went to the friend's house, and J.M. agreed to stay with her aunt instead. J.M. stayed with her aunt about a week, when P.W. contacted the Burnham police again, and the police went to the aunt's house and brought J.M. home. Before J.M. ran away, J.M. and P.W. had fights but they were "mother-daughter, you know, teenage [disagreements], but nothing serious. Nothing out of the norm."

¶ 81    P.W. testified that, after J.M. returned home from her aunt's house, the youth division at the Burnham police department set up an evaluation the next morning at St. Margaret Mercy Hospital for the family. J.M. went with her parents, both P.W. and defendant. After returning home from the hospital evaluation, P.W. decided to go to Wal-Mart and J.M. asked to go with her. However, they never made it there. During the vehicle ride, J.M. said she wanted to come with P.W. to discuss her behavior. J.M. started crying and saying that her mother did not understand, and P.W. begged: "whatever it is, just tell me." P.W. testified: "After some time, back and forth, she finally came out and said [defendant] had been molesting her for the last year and a half." J.M. did not provide any specific details; "[s]he just cried and cried" and "kept saying [']I'm sorry.['] " P.W. pulled into a parking lot, held her and told J.M. that she did not have anything to be sorry for. P.W. said that she was sorry that this had happened to her and that it was not J.M.'s fault.

¶ 82    P.W. testified that she then drove them to the Burnham police department. After that point, she had no relationship with defendant and told him to move out of the house. She placed all his belongings in his vehicle and drove it to his parents' house. They were divorced later in 2007, and defendant provided $200 per month for the children. Approximately five days after defendant moved out of the house, defendant telephoned P.W. at her workplace to say that he was sorry, that he wanted to kill himself and that he wanted to cut his wrists. P.W. told him to go ahead and do it, and asked why he was calling her.

¶ 83    P.W. testified that, after defendant moved out of the house, he did not visit J.M. However, after about three months, she allowed her two younger daughters to visit defendant. P.W. and defendant's sister attended the same church, and the visit was arranged through defendant's sister. The two younger daughters were close to "their dad" and "they would cry because they wanted to see him." P.W. believed J.M. but she did not think that "he would attempt to do this again." P.W. was "just torn." Her daughter Y.C. was 11 years old when P.W. let her see defendant again, and her daughter A.C. was 6.

¶ 84    P.W. testified that, before J.M. started high school, J.M.'s relationship with defendant was fine. J.M. looked up to him as her stepdad. J.M. was very active in sports but she withdrew from sports sometime during her freshman year at Fountain Valley. During 2006 and 2007, there were normal disagreements between herself and J.M., and J.M. would be punished. P.W. was the disciplinarian in the family.

¶ 85    On cross-examination, P.W. testified that, other than J.M.'s cutting back from sports, P.W. did not notice a change in J.M.'s behavior until the fall of 2006. In the fall of 2006, J.M. told P.W. that she wanted to come home. P.W. travelled to Colorado in September 2006 without defendant to retrieve J.M. and stayed a couple of days in Colorado before returning home.

During this time, J.M. did not say anything about a sexual assault or molestation. At first when J.M. returned home, she acted normally but, at some point during the fall, J.M. "started acting out." However, J.M. did not say anything about sexual abuse until after she ran away from home in January 2007.

¶ 86 On cross-examination, P.W. testified that, after J.M. returned home from her aunt's house, P.W. and defendant took J.M. to a hospital. On the way home from the hospital, P.W. informed J.M. that she was grounded. After P.W. informed J.M. that she was grounded, defendant asked if he could take J.M. to a photo shoot or a car show and P.W. agreed. J.M. "didn't say no." P.W. did not observe a change in the relationship between J.M. and defendant until January 2007. Even during the time in the fall of 2006 when J.M.'s behavior changed and she was acting out, her relationship with her stepfather appeared positive. After the divorce, defendant continued taking care of the other children but not J.M. Defendant took them to movies and bought food and clothes for them when he was with them, and he never missed one of his $200 monthly payments.

¶ 87 On cross-examination, P.W. testified that, after J.M.'s outcry in January 2007, she moved from Burnham to Indiana, and defendant moved their refrigerator into his house. Defendant also brought some of the children's belongings from his house to the home in Indiana. When P.W. returned from Indiana to Burnham, defendant returned the refrigerator.

¶ 88 On cross-examination, P.W. testified that, during the trip to Wal-Mart in January 2007, J.M. did not say anything about anal sex or provide details about specific instances. "[S]he just cried and said that he molested her for a year and a half." After P.W. left the Burnham police department on January 20, 2007, with J.M., they returned home and sometime later a Burnham police officer came to their home and collected J.M.'s bed sheets. P.W. informed the officer that it had been about two weeks since the sheets had been washed. At the time that the sheets were collected, P.W. was unaware that defendant had slept with a boy her own age in her bed.

¶ 89 P.W. testified that she did not approve of J.M.'s marijuana use and confronted her about it at some point. However, P.W. grounded J.M. because of J.M.'s grades dropping in school and cutting class. P.W.'s "main objective" in grounding J.M. was school. Approximately three months after defendant moved out of the house, P.W. allowed him to see her younger daughters. However, she "always believed" J.M. At first, she did not allow them to stay with him overnight. However, in the summer, when they were out of school, they stayed with him for days at a time, such as a weekend. When her younger daughters visited defendant, she would bring them to Hammond, Indiana, and he would meet her there, and he would take them to where he was staying in Valparaiso, Indiana, with his friend Ricky, whom the girls called "Uncle Ricky." P.W. never heard the girls complain about any inappropriate behavior, and the girls did not appear uncomfortable around him. At some point, defendant moved from Indiana back to Chicago.

¶ 90 P.W. testified that, during the two weeks before Thanksgiving, the girls stayed with defendant in his house in South Dearing, because she was moving to Portage and she did not want to pull them out of school. P.W. brought the girls to his home in South Dearing regularly to visit defendant, and she did not observe any unusual behavior by the girls and they did not appear reluctant to be with him. These visits were part of an agreement that P.W. and defendant had reached as part of their divorce, and they lasted until August 2009. P.W. allowed the children to visit because they wanted to see their "dad."

¶ 91    On redirect, P.W. testified that, prior to J.M.'s outcry, her marriage was "fine;" they had just bought a house and they were happy. Before J.M. ran away in January 2007, there had been a change in J.M.'s behavior for the worse and, as a result, there was some friction between herself and J.M. For a short time after J.M.'s outcry, their relationship improved, but P.W. continued to have some problems with her daughter and sometimes needed to punish her. Although defendant was no longer in the home, these behavioral issues continued until J.M. moved out of the Burnham home in September 2007.

¶ 92                              D. The Victim's Aunt, C.M.

¶ 93    C.M., the victim's aunt, testified that, since J.M. was her brother's daughter, she had spent time with J.M. throughout J.M.'s life. In January 2007, J.M. lived with C.M. for a few weeks. On January 17, 2007, J.M. and C.M. were in C.M.'s home and J.M. said that her step-father was molesting her. C.M. wanted J.M. to tell her mother and to go to the police station, but J.M. did not want to; so C.M. said that, if J.M. did not tell her mother, C.M. would.

¶ 94    On cross, C.M. testified that she picked J.M. up at J.M.'s friend's house in Indiana and brought J.M. to her house. C.M. denied that defendant had picked up J.M. Before picking up J.M., C.M. had spoken with J.M.'s mother. Prior to J.M.'s outcry, J.M. wanted to go to a party but C.M. would not let her go because C.M. had no money, so J.M. made a telephone call. Then C.M. was looking out the window when she observed defendant drive up in his truck. J.M. went outside and entered the truck, and C.M. observed "his hand kind of go toward her face and something that you don't really do to a teenage girl like that." When J.M. reentered the house, C.M. confronted her and asked "what was going on," but J.M. did not want to tell her. C.M. said that, if J.M. did not tell her, she was "going to go have a talk with" defendant. That is when C.M. told J.M. "the truth," and "cried and cried," and told C.M. that defendant was molesting her. C.M. told J.M. that she needed to tell her mother and to go to the police station. J.M. wanted to be the one to tell her mother.

¶ 95    On cross, C.M. testified that, when a detective called and asked her to come to the Burnham police station, she provided this information to the police. J.M. had told C.M. about anal sex, and C.M. relayed to the police everything that J.M. had told her.

¶ 96                              E. Dr. Rangala

¶ 97    Dr. Sangita Rangala, the medical doctor who examined J.M., testified that she worked at Edward Hospital in Naperville as an attending physician in emergency medicine and as the medical director of the Edward Hospital Care Center, which offers services for children who may have been sexually abused. As director, she has personally examined almost a thousand children who alleged sexual abuse. When Dr. Rangala examines a child, she expects to see a normal exam, because, "[e]ven in children who have reported penetration, [the] opening in the middle of the hymen can be large enough to allow the penetration of an object without any stretching. Also, if the object is slightly larger than [the] opening, the hymen can stretch and then return right back to normal ***." The doctor further explained that, "[i]f the object actually causes a tear, the vast majority of those tears will heal within the first 48 to 72 hours; and, in fact, unless we see a child within that time frame, the rate of normal is almost 100 percent."

¶ 98     Dr. Rangala testified that, when she examined J.M. on February 5, 2007, she observed "a transection or a through-and-through tear of the hymen." When asked for her conclusions about this tear, the doctor explained: "We know that there had to have been something pressing against the hymen with enough force to tear it, but what that something was and under what setting, we don't know." The doctor concluded, within a reasonable degree of scientific certainty that "the transection to the hymen is consistent with penetrating sexual trauma." However, it is also possible that the tear occurred during consensual sex.

¶ 99     Dr. Rangala testified that, during the same examination on February 5, 2007, she found that, at that time, J.M.'s anal area was normal, which is what she would expect to find. The doctor explained that "the rate of normal findings in the anal area after sexual abuse involving the anus is even more normal than [for] the genital area. *** Less than 1 percent of children who report anal penetration or any abuse of some kind, less than a fraction of 1 percent, will actually have evidence of findings on [an] exam, and if they're examined more than 24 hours after the initial incident, it's almost zero."

¶ 100     Dr. Rangala testified that, when J.M. arrived on February 5, 2007, J.M. was accompanied by her mother and they were transported to the Care Center by the Burnham police. During the examination, J.M. did not report any current pain but stated that she had experienced pain during the abuse by her stepfather. Dr. Rangala completed a "head-to-toe" physical examination that was "essentially normal."

¶ 101     On cross-examination, Dr. Rangala testified that she did not believe that the transection, or tear to the hymen which she had observed on J.M., had occurred within 72 hours. The doctor explained: "the edges of the transection were completely healed, there were no raw edges, there was no fresh blood, and that's why it puts it outside of the 24 to 72 hour window." Her conclusion was that the tear occurred "at least 14 days" earlier and "it may have been [caused] months to years before that."

¶ 102     On cross-examination, Dr. Rangala testified that, of the 95% to 98% of the children who report sex abuse but who have normal examinations, it is possible that some of them are making false reports, and Dr. Rangala is not an expert in false reporting. Based solely on a medical examination of the genital area, Dr. Rangala cannot be "a hundred percent" certain whether or not a child is making a false report. However, "out of the several hundred that [she's] heard back about," "less than a handful" were "found to have false reports."

¶ 103     On cross-examination, Dr. Rangala testified that she had never observed an anal injury during an examination occurring more than 72 hours after the alleged abuse. However, she did read about one in a book. During the head-to-toe examination of J.M., Dr. Rangala did not observe any bruises, scratches, welts or abrasions generally on her body nor any tears, fissures or welts around the anus. During the examination, J.M. stated that she first engaged in consensual vaginal intercourse when she was 14 years old. Dr. Rangala could not state, to a reasonable degree of scientific certainty, whether the injury which she observed during J.M.'s examination was the result of sex abuse.

¶ 104     On redirect examination, when asked whether J.M. stated that the last time she had consensual sex was age 14, Dr. Rangala answered "I believe so."

¶ 105                              F. The Victim's Sister, Y.C.

¶ 106    The victim's younger sister, Y.C., testified that she was 15 years old, in the tenth grade, and living with her mom, her 17-year-old brother and her 10-year-old sister. She used to live also with her "dad" and sister, J.M. She started living with defendant when she was a baby, and has never had any other father figure. In January and February 2008, when she was 12, she lived in Burnham, defendant lived in Chesterton, and she visited him on the weekends with her younger sister, who was then 5 years old. One time, when she was spending the weekend at defendant's house, she fell asleep on the floor and she woke up in the middle of the night, because she felt somebody touching her. She observed "something dirty" on the television with a naked man and woman, and she realized that her "dad's" penis was "in between [her] feet." She moved her legs to stop him, and she felt him stop and wipe a towel on her feet. Then she observed that the television switched to a different channel. No one was in the house that night, or that morning when she woke up, except for herself, her younger sister and defendant.

¶ 107    Y.C. testified that, on a different night in January or February 2008, she was asleep in her bedroom in defendant's house in Chicago and she again woke up because someone was touching her. She felt defendant's hands on the back of her thighs and moving up. Then it felt like someone was going on top of the bed, with each leg on either side of her. She was scared and moved as though she was about to wake up, and he left. Again, no one was in the house that night or that morning when she woke up, except for herself, her younger sister and defendant.

¶ 108    Y.C. testified that in June and July 2009, she was 13, and she was in defendant's vehicle, when he was either picking her up or dropping her off, and he went to give her "a normal kiss" and instead he stuck his tongue in her mouth. During the same two months, there was another time when everyone else was outside and swimming in their pool, and Y.C. walked into defendant's bedroom as he was counting money. He showed her an amount of money and told her he would give it to her if he showed him her "butt" or her "boob," and she said no. Then he said he would give her money, or a computer, or a camera, but she said no.

¶ 109    Y.C. testified about a third incident that happened during June or July 2009 when she and her sister were sleeping with defendant in defendant's bed. Y.C. woke up in the middle of the night because defendant was holding her hand and rubbing it, up and down, against his penis. Y.C. moved her fingers, and defendant let go of her hand. When Y.C. described these different events, she referred to defendant as her "dad."

¶ 110    On cross-examination, Y.C. admitted that, when she testified on direct examination to certain incidents happening in June or July, it was "[a]round that time" but she did not recall the specific month. When someone was touching her feet, she did not turn around to look at the person; however, defendant was the only male in the house at that time. When she felt someone touching her thighs, she did not observe the person or the hand; however it was a male hand, and defendant was the only male in the house. Y.C. knew it was a male hand because it was a "big, rough hand." The only other person in the house was Y.C.'s little sister who does not have big, rough hands. Y.C. did not scream or cry during these incidents and did not inform her mother immediately after they happened.

¶ 111    At a sidebar, out of the presence of the jury, defense counsel renewed his objection to admission of the other crimes evidence concerning Y.C. and the trial court stated that its previous ruling stood.

¶ 112    The cross-examination continued, and Y.C. testified that during 2008 and through the summer of 2009, she did not inform anyone about these incidents. The first person Y.C. told

was her sister J.M., in their mother's house in Burnham. When J.M. returned to Chicago in the late summer of 2009, J.M. initiated a conversation to explain why she wanted to leave again. She was leaving because "it was too much for her to handle," observing defendant come to the house to pick up Y.C. and their younger sister. Y.C. then told J.M. "what had happened" to Y.C. J.M. stayed only a few days in Burnham and then went to live with their grandparents. However, J.M. did not leave until Y.C. had gone to the police station.

¶ 113    On redirect, Y.C. testified that, during these incidents with defendant, when she woke up, she tried to pretend as though she was still sleeping. When she testified that she moved, it was a twitching as though she were still asleep. During the conversation when J.M. explained why she was leaving, she also said that, if defendant did anything to Y.C., she had to speak up. Y.C. started crying and told her what defendant had done to her, including the time that she felt something wet and slimy on her feet.

¶ 114                          G. Stipulations Introduced by the State

¶ 115    The parties then stipulated: (1) that if Brian Zima, a Burnham police officer, were called to testify he would state that he retrieved bed sheets from the victim's Burnham residence on January 20, 2007, and a buccal swab standard from defendant for purposes of DNA analysis; (2) that if Kelly Krajnik, a forensic biologist, were called to testify she would state that she identified five semen stains on the bed sheets; and (3) that if Katherine Sullivan, a forensic DNA analyst, was called to testify she would testify that the male DNA profile identified in the five semen stains originated from the same person but did not match defendant.

¶ 116    The State also offered into evidence, without objection, certified copies of J.M.'s birth certificate and the marriage certificate between defendant and J.M.'s mother. At the end of the State's case, the defense moved for a directed verdict which was denied.

¶ 117                          H. Defendant's Neighbor, Wanda Soto

¶ 118    Wanda Soto testified that she was 39 years old, a deputy sheriff with Cook County and a childhood friend of P.W., J.M.'s mother. Soto had known defendant for 10 years, and she knew P.W. for 20 years before she met defendant. From October 2008 until 2010, she rented the main floor of a single-family home from defendant's father, and defendant lived in the basement unit. Defendant's two youngest daughters, Y.C. and A.C., came to visit him frequently and stayed overnight. Soto's daughter, who was 10 in 2008 and 11 in 2009 and thus similar in age to Y.C., would sometimes sleep over in defendant's home. During these sleepovers, defendant was the adult in the house. When Soto's daughter returned from these sleepovers, she did not describe anything unusual and appeared to be in a good mood. Defendant appeared to have a normal father-daughter relationship with both Y.C. and A.C. Y.C. did not act unusually with defendant and did not appear reluctant to go to defendant when her mother dropped her off.

¶ 119    Soto testified that the house which she and defendant shared had a big yard, a swimming pool and a garage where defendant worked on vehicles. Soto did not observe defendant host any "functions" at the house. Neither Y.C. nor A.C. complained to Soto about their father.

¶ 120    On cross-examination, Soto testified that her daughter slept over at defendant's unit "[n]o more than twice" and only when his daughters visited. Although Soto knows defendant's

daughters, she does not spend "one-on-one time with them."

¶ 121                                          I. Defendant's Niece, A.P.

¶ 122        A.P. testified that she is 16 years old, and that her mother is defendant's sister and so he is her uncle. Defendant never acted inappropriately toward her. When defendant lived in the South Dearing neighborhood, she lived across the street with her mother, another uncle and her grandparents. She spent time with Y.C. downstairs in defendant's house and in the pool. They also held family cookouts and "get-togethers" at defendant's house. When A.P. was at defendant's house, they would "hang out, eat food, watch movies, play games." A.P. did not observe defendant acting unusually toward Y.C., and Y.C. did not appear uncomfortable in his presence. A.P. slept over at defendant's house 10 or 12 times, and he never acted inappropriately toward her. She never observed him watching dirty movies.

¶ 123        On cross, A.P. testified that she would sleep over at defendant's house only if his daughters were visiting, and the sleepovers were during the summer of 2009. She did not recall any sleepovers that occurred before the summer of 2009.

¶ 124        On redirect, A.P. testified that, before 2010, she and Y.M. were close but, starting in 2010, they were not close due to "this stuff." Sometimes, she slept over when defendant was still living at the Burnham house and J.M. was there. Concerning J.M.'s relationship with defendant, A.P. testified that "[t]hey would talk but she would basically be downstairs, and he would be upstairs." However J.M. did not appear uncomfortable around defendant.

¶ 125        On recross, A.P. testified that she was no longer close with Y.C. because of the things that Y.C. said about her uncle.


¶ 126                                          J. Defendant's Sister, Ermelinda Cerda

¶ 127        Ermelinda Cerda, defendant's sister, testified that she was a women's advocate for a domestic violence shelter in Chicago and the mother of four daughters and a son. Her daughters are ages 16, 10, 6 and 2; and her son is 13. The 16-year-old is A.P. In 2009, she and her children moved into the second floor of her parents' house in the South Dearing neighborhood, and her parents lived downstairs. Cerda continued to see P.W., such as at family gatherings, after P.W. and defendant divorced.

¶ 128        Cerda testified that, from the time that P.W. and defendant married through October 2005, Cerda would stop by their house when she visited her mother, because her mother's house was just across the street. Cerda's daughter A.P. spent time with Y.C. Between Thanksgiving 2005 and the spring of 2009 when Cerda moved into her parents' home, Cerda observed defendant and J.M. together, and their activities appeared normal.

¶ 129        Cerda testified that she was at defendant's home in Burnham for Thanksgiving 2006[2] and observed that defendant, P.W. and all of P.W.'s children were there. The family was busy preparing for the holiday. At no time prior to January 2009 did Cerda observe J.M. acting uncomfortably with defendant.

¶ 130        Cerda testified that, in the spring of 2009 when she moved into her parents' house, defendant was living across the street from defendant's house. During the summer of 2009, Cerda observed P.W. drop off her daughters, Y.C. and A.C., at defendant's house. The girls

_____

[2]It was during the 2005 Thanksgiving break that J.M. testified the first abuse occurred.

- 19 -

"couldn't wait" to be at defendant's house "because [he] had the swimming pool and they would just be in the yard cooking out." Y.C. and A.C. "were there all the time." Y.C. did not appear unhappy at defendant's home or reluctant to be dropped off there. During the summer of 2009, her daughter slept over at defendant's house not more than five times. Cerda never observed any inappropriate contact or relationship between defendant and Y.C.

¶ 131 During cross-examination, Cerda testified that, on Thanksgiving in 2006, there were a lot of people gathered and the house was crowded. In front of all those people, defendant's daughters acted normally. During the summer of 2009, Y.C. and A.C. were at defendant's house almost every day. Defendant is Cerda's big brother, and she loves him unconditionally, and there is nothing anyone could do or say that could change that.

¶ 132                                         K. Defendant

¶ 133 Defendant testified that he was 47 years old and that he had one felony conviction from 2007[3] related to drugs. When he first met his wife, she already had one son and two daughters, J.M. and Y.C. Together, the couple had one daughter, A.C. From the time that he met his wife until Thanksgiving 2005, he had a "great" and "[t]ypical teenage[r] and father relationship" with J.M. On Thanksgiving 2005, the family was living in a house in the South Dearing neighborhood. During that Thanksgiving school break, he did not enter J.M.'s room in the basement and he did not commit any of the acts about which J.M. testified.

¶ 134 Defendant testified that, in January 2007, he went with J.M. and her mother to a hospital and he was with them during the hospital visit. During the drive on the way home, he received a telephone call that people were waiting for him to do a "photo shoot" for his vehicle. J.M. asked if she could go with him, and he replied that she had to ask her mother because she had just been "grounded." "Grounded" meant that J.M. lost her cellular telephone and she could not invite friends over. After they arrived home, he received another call and J.M. asked again if she could go and her mother agreed. When J.M. and defendant arrived at the photo shoot, they were interviewed, then photographs were taken, and they drove home. The photo shoot was for a magazine article. J.M.'s behavior was not any different toward defendant than it had been prior to Thanksgiving 2005.

¶ 135 Defendant testified that, "during the relevant time period," he was employed outside the home doing carpentry and rehab work, as well as customizing vehicles. He worked on vehicles at home. At this time, the automobile and carpentry work were his primary sources of income. After the photo shoot in January 2007, defendant and J.M. drove home, and then J.M. went somewhere with her mother, while defendant stayed home with Y.C. One or two hours later, the police arrived and escorted him to the Burnham police station for questioning. After 72 hours, the police released him and told him that he could not return home. Prior to his arrest in January 2007, his marriage was already "on the rocks," but not his relationship with the children. He loved his children. Prior to his arrest, he had a "typical father and daughter" relationship with J.M. If J.M. had a problem, she would come to defendant, not her mother.

¶ 136 Defendant testified that, a week after his arrest, he went to stay with his friend Rick who lived in Chesterton, Indiana. His daughters, Y.C. and A.C., came to visit him in Indiana, on the weekends when they were in school and for longer periods during the summer. He had a wonderful relationship with Y.C., like he had with all his children, and that relationship did not

_____
[3]On cross-examination, defendant later admitted that the drug conviction was in 2009, not 2007.

- 20 -

change until he was arrested in 2009. At some point, defendant left Indiana and returned to the house in South Dearing, where he lived in the basement and Juan Soto lived upstairs. The visits with Y.C. and A.C. continued like before. In February 2008, nothing happened between himself and Y.C.; and in August 2009, he did not do anything to Y.C. that she described at trial. Y.C. never appeared reluctant to come to his house.

¶ 137    Defendant testified that his visits with Y.C. ended when he was arrested in 2009 for the charges concerning J.M. Between his first arrest in January 2007 until September 2009, he did not see J.M. After his second arrest in September 2009, he did see J.M. in the driveway of the house in Burnham. He first learned of the allegations that Y.C. had made when the police arrested him in September 2009. In the time period between the two arrests, defendant had contact with his ex-wife, P.W., primarily when he picked up the children. In addition, at one point when she was moving, he helped her move a refrigerator, a stove, some boxes and some of the children's belongings to his house.

¶ 138    Defendant testified that he first noticed bad behavior by J.M. when she left Fountain Valley in Colorado and enrolled in a local school at the start of her sophomore year. His relationship with her did not change, although defendant and her mother tried to make J.M. "straighten up" her grades. He never threatened J.M. or Y.C.

¶ 139    On cross-examination, defendant testified that his marriage had been "on the rocks" for 2½ to 3 years prior to his first arrest in January 2007. It was on the rocks when they moved into the Burnham house in 2006, and when they lived in the house in South Dearing owned by his father. Even though the marriage was on the rocks, he chose not to stay in his father's house and he moved with the family to Burnham, until his wife kicked him out of the Burnham house in January 2007. Although he had been unhappy for years, he did not do anything to end the marriage.

¶ 140    On cross, defendant testified that, before P.W. became a corrections officer, he was employed regularly as a union carpenter. However, when she became a sheriff, she wanted him to discontinue working for the local union, so he quit that job to take care of the children. He watched the children when she was at work, and she watched the children when he worked. Defendant took the children to school and then worked rehabilitating homes while they were in school. He then stopped work to pick them up and took care of them after school.

¶ 141    On cross, defendant testified that the mother was the primary disciplinarian. After J.M. returned from Colorado, she started misbehaving, cutting class, smoking marijuana, stopping sports and letting her grades slip. Although his relationship with J.M. remained the same, J.M. and her mother fought. Similarly, there were no problems between defendant and Y.C. before she made allegations against him. In June or July 2009, Y.C. became upset with her parents because she was going to spend a weekend with some friends and she was grounded as a punishment.

¶ 142    On cross, defendant stated that, a few days after he was arrested in response to J.M.'s allegations and then released, he called his wife at work to say that he was sorry and that he did not feel like living. However, he did not say that the wanted to kill himself. Defendant explained that he was sorry for the state of their marriage but his call was completely unrelated to Y.C.'s allegations.

¶ 143    On cross, defendant testified that, most nights when Y.C. and A.C. spent the night at his house, there was not anyone else in the home apart from the three of them. Defendant also

admitted that his drug conviction was on June 24, 2009, not in 2007 as he had stated on direct examination.

¶ 144                               L. Stipulations, Introduced by the Defense

¶ 145    The parties stipulated that: (1) if Brian Zima, a Burnham police officer, was called to testify, he would testify that, on January 19, 2007, he transported J.M. from her aunt's house to the Burnham police department and that, on January 20, 2007, when he arrived at J.M.'s home to collect her bed sheets, he was told that they had not been washed during the prior two weeks; (2) if Sergeant John Daley of the Burnham police department was called to testify, he would testify (a) that, on January 20, 2007, he interviewed P.W. who informed him that during J.M.'s second year of boarding school, J.M. begged to stay home and attend school locally, (b) that on January 20, 2007, he interviewed J.M. who described acts of sexual intercourse by defendant without using words to refer to either the anus or vagina, and (c) that J.M. did not complain to him about a sex act occurring during the Christmas 2005 break; and (3) if Detective Gregory Granadon of the Chicago police department were called to testify, he would testify that, on September 2, 2009, he interviewed Y.C. who informed him (a) that the first time something happened was in February 2008, when she was in her bedroom and felt someone touching her legs, (b) that the second time something happened was one week later when she was sleeping on the floor watching television; and (c) the last time something happened was in the beginning of August 2009 when she woke up in defendant's bed with her sister A.C.

¶ 146                          IV. Conviction, Sentence and Posttrial Motion

¶ 147    On December 1, 2011, the jury convicted defendant of all the remaining counts which were counts I through IV.

¶ 148    In his posttrial motion filed December 30, 2011, defendant claimed, among other things, (1) that the State's evidence was insufficient; (2) that the State should have been barred from introducing other crimes evidence; and (3) that the trial court erred by excluding evidence pursuant to the rape shield statute. With respect to the rape shield statute, defendant argued that the trial court erred in denying defendant the opportunity to cross-examine (a) "[S.B.] regarding her past sexual relationship with, and/or interest in, victim [J.M.]"; and (b) "victim [J.M.] and/or her mother *** regarding evidence that [J.M.] had sexual intercourse with a boy her own age for the first time, and in her mother's home, during the week in which the Defendant is alleged to have committed the first criminal sexual assault" against J.M. in 2005. Defendant stated that, specifically, he would have cross-examined the victim and her mother concerning "the relationship (in terms of timing) between [J.M.'s] outcry and her own acts with the boy, and [the mother's] reaction to learning of [J.M.'s] acts with the boy."

¶ 149    At sentencing on January 25, 2012, the defense rested on its written posttrial motion, which the trial court denied. The State argued that the sentencing range for each count was between 4 and 15 years, and that the sentences had to be served consecutively. The State also informed the court that the State had nol-prossed the charges related to Y.C. The trial court then sentenced defendant to four consecutive 10-year terms, and this appeal followed.

¶ 150                                        ANALYSIS

¶ 151    On this direct appeal, defendant claims: (1) that the State failed to prove him guilty beyond a reasonable doubt because both the complainant's testimony and the other crimes evidence were inherently unbelievable; (2) that the trial court violated defendant's right to present a defense and confront the witnesses against him by excluding evidence, pursuant to the rape shield statute (725 ILCS 5/115-7(a)(2) (West 2010)), concerning the victim's past sexual experience; and (3) that the trial court erred by allowing the State to introduce evidence of other sexual assaults committed by defendant against J.M. and another step-daughter. For the following reasons, we affirm.

¶ 152                    I. Sufficiency of the Evidence

¶ 153    Defendant's first claim is that the evidence at trial was insufficient to prove him guilty beyond a reasonable doubt because both the complainant's testimony and the other crimes evidence were inherently unbelievable. For the following reasons, we do not find this claim persuasive.

¶ 154                    A. Standard of Review

¶ 155    When a defendant challenges the sufficiency of the evidence, our standard of review is whether, when viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Davison*, 233 Ill. 2d 30, 43 (2009) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). When considering a challenge to a criminal conviction based on the sufficiency of the evidence, it is not the role of the appellate court to retry the defendant. *People v. Hall*, 194 Ill. 2d 305, 329-30 (2000). Only where the evidence is so improbable or unsatisfactory as to create a reasonable doubt of the defendant's guilt will a conviction be set aside. *Hall*, 194 Ill. 2d at 330.

¶ 156    In this sufficiency claim, defendant argues that the testimony of the victim, J.M., and the testimony of his other stepdaughter, Y.C., who provided other crimes evidence, were both inherently unbelievable. As a preliminary matter, we observe that it is the job of the fact finder to make determinations about witness credibility and that the fact finder's credibility determinations are entitled to great deference and will be disturbed rarely on appeal. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224, 228 (2009); *People v. Williams*, 2013 IL App (1st) 111116, ¶ 76; *People v. Bowie*, 36 Ill. App. 3d 177, 180 (1976). This deferential standard of review exists because the fact finder is in a superior position to determine and weigh the credibility of the witnesses, observe witnesses' demeanor and resolve conflicts in their testimony. *People v. Jones*, 215 Ill. 2d 261, 268 (2005); *People v. Lomax*, 2012 IL App (1st) 103016, ¶ 19.

¶ 157                    B. Elements of Offense

¶ 158    Defendant was convicted of four counts of criminal sexual assault of a family member (720 ILCS 5/12-13(a)(3) (West 2006)) charging: (1) contact between defendant's penis and J.M.'s vagina between March 1, 2006, and March 31, 2006; (2) contact between defendant's penis and J.M.'s mouth between May 1, 2006, and January 1, 2007; (3) contact between defendant's penis and J.M.'s anus between January 1, 2007, and January 31, 2007; and (4) contact between defendant's penis and J.M.'s vagina between May 1, 2006, and January 31, 2007.

¶ 159    Section 12-13(a)(3) of the Criminal Code of 1961 provides:

"(a) The accused commits criminal sexual assault if her or she:

\* \* \*

(3) commits an act of sexual penetration with a victim who was under 18 years of age when the act was committed and the accused was a family member[.]" 720 ILCS 5/12-13(a)(3) (West 2006).

On this appeal, defendant does not contest either (1) that the "victim" was "under 18 years of age" when the alleged acts were committed or (2) that he was "a family member." 720 ILCS 5/12-13(a)(3) (West 2006). Thus, the only element at issue is (3), whether defendant committed "act[s] of sexual penetration." 720 ILCS 5/12-13(a)(3) (West 2006). With respect to this element, defendant does not argue that acts were committed but that they did not qualify as "penetration." 720 ILCS 5/12-13(a)(3) (West 2006). Instead, defendant's only argument with respect to this element is that no sex "act[s]" at all were committed by him on J.M. 720 ILCS 5/12-13(a)(3) (West 2006). We address this argument below.

¶ 160                                    C. Sufficient Evidence

¶ 161    Defendant claims that the evidence at trial was insufficient to prove that he committed sex acts with J.M. in light of the facts: (1) that the only direct evidence of the offenses was J.M.'s testimony and her testimony was unbelievable; (2) that the other crimes evidence provided by the testimony of Y.C., another stepdaughter, was also unbelievable; (3) that the mother of both girls continued to allow her younger daughters to visit defendant even after J.M.'s outcry; (4) that DNA evidence established that defendant was not the source of semen stains found on J.M.'s bed sheets; and (5) that defendant testified at trial to enjoying a normal father-daughter relationship with his stepdaughters.

¶ 162    We will address defendant's primary argument, that J.M. was unbelievable, in more detail below, and address his secondary argument about the other crimes evidence in the following section about other crimes evidence.

¶ 163    As for defendant's third argument, although the mother allowed her younger daughters to have overnight visits with defendant after J.M.'s outcry, the mother testified that she did not think defendant would molest her younger daughters, then ages 12 and 7. Also whether or not the mother believed J.M. is not the issue before us. The issue is whether, viewing the evidence in the light most favorable to the State, any rational juror could have believed J.M. and found defendant guilty beyond a reasonable doubt. *Davison*, 233 Ill. 2d at 43 (citing *Jackson*, 443 U.S. at 319). Fourth, the DNA evidence actually corroborated J.M., who testified that, although defendant never ejaculated in her bed, she did have intercourse in her bed with a boy close to her age. Fifth, although defendant's attorneys argue that his testimony was sincere, his testimony was for the jurors to weigh and they did not reach the same conclusion. *In re Jonathon C.B.*, 2011 IL 107750, ¶ 59 ("The trier of fact is best equipped to judge the credibility of witnesses \*\*\*."); *People v. Moser*, 356 Ill. App. 3d 900, 911 (2005) ("Although the defendant's and his witnesses' version of events was much different from that of [the State's witness], it was the prerogative of the jury to conclude that [the State's witness's] version was more credible.").

¶ 164     Defendant's primary argument in support of his insufficiency claim is that the victim, J.M., was unbelievable, and his appellate brief advances 11 numbered reasons concerning why we should conclude, despite the jury verdict, that defendant was unbelievable.

¶ 165     Before we analyze each of defendant's 11 reasons, we must observe that the victim was cross-examined thoroughly. She was asked some of the same questions again and again, as well as compound questions, and, even from a cold transcript, it is apparent that she provided the same answers. When asked questions which contained a factual error, she corrected the error before answering. What stands out from a reading of the complete transcript of her testimony is the consistency of her answers. It is not our job to judge her credibility; the jury already did that. However, the cold transcript provides us with no reason to conclude that the jury's verdict was irrational.

¶ 166     First, defendant argues that the victim's testimony lacked specificity. As the victim testified, defendant's abuse occurred a couple of times a week, every week that she was home, for a year and a half. In light of the sheer number of times and the frequency, it is not surprising that she could not recall the exact details of each specific act.

¶ 167     Second, defendant argues that the DNA evidence recovered from the semen stains on the victim's bedsheets did not provide a match to defendant. However, the victim readily admitted in her testimony that she had sex with a boy her own age in January 2007 and defendant had the opportunity to cross-examine her on this point and did, asking her questions such as whether the boy ejaculated and when the sex occurred.

¶ 168     Third, defendant claims that the timing of the victim's outcry makes it suspect. On cross, J.M. testified that, in January 2007, she and her mother were fighting about J.M.'s use of cannabis and about how J.M. spent her time with her friends outside of school. Defendant argues that J.M.'s outcry, which was also in January 2007, was an attempt to deflect her mother's anger away from her own behavior. However, the jury could have also concluded that J.M. was acting out as a result of the sexual abuse she had endured. Defendant also argues that it makes no sense for J.M. to request to go to a car show with defendant immediately before making an outcry. However, the victim, who was only 15 years old at the time, explained that she wanted to make everything seem normal, so defendant would not suspect that she was about to tell her mother. As to defendant's other points, the jury had an opportunity to hear her testimony firsthand, observe her demeanor, and resolve any disputes about credibility.

¶ 169     Fourth, defendant argues that the State's implication that J.M.'s bad behavior was caused by defendant's abuse was not supported by the record, because the abuse began in 2005 and J.M.'s behavior did not decline until the fall of 2006, when she returned home from boarding school. However, the jury could take note of the fact that her behavior did not decline until she was living full-time with defendant and subjected to his abuse on a regular basis, instead of only on vacation breaks.

¶ 170     Fifth, J.M. testified that she asked to come home from boarding school "[b]ecause [she] was afraid [that] what he was doing to [her] he was going to do to [her] sister." J.M.'s sister Y.C. was only 10 years old in 2006 and her sister A.C. was only five years old. Defendant attacks this statement because J.M. did not then report the abuse to her mother and she also left the house at times when her sisters were then alone with defendant. The implication that a child should know how to properly handle this situation and that she was responsible for guarding her sisters is an implication that the jury was free to reject.

¶ 171    Sixth, defendant argues that the victim's mother did not observe a change in J.M.'s relationship with defendant until January 2007. However, the mother also testified that J.M.'s behavior deteriorated when J.M. returned from boarding school and was living at home full-time. J.M. testified that, during this time, defendant was abusing her every week and she was "acting out" because of the abuse. However, she was afraid to tell anyone because she was scared and she did not know what defendant was "capable of doing to her." When she decided to tell her mother, J.M. acted normally because she did not want defendant to suspect anything. The jurors heard firsthand the victim's explanation of both her acting-out and her normal-appearing behavior toward defendant, and they were free to come to their own conclusions.

¶ 172    Seventh, J.M. testified on cross-examination that defendant had sex with her every time she came home from Colorado, including over the Christmas 2005 break. Defendant claims that this "revelation" of additional sexual abuse is suspect. When asked whether she told anyone about the sex over the Christmas 2005 break, she replied: "I have stated it happened for a year and a half of my life. Every time I came home. For the whole summer. I'm not going to remember every single time to tell them." In addition, defendant claims that J.M. revealed for the first time that she also told a friend in January 2007 about the abuse, in addition to her aunt, her mother and S.B. Since this additional friend was not called to testify at trial, it is not clear how this assertion could have helped the State's case.

¶ 173    Eighth, defendant argues that, if J.M.'s mother had believed J.M.'s allegations in January 2007, she would not have allowed her younger daughters to stay overnight at defendant's home. However, J.M.'s mother flatly contradicted this argument in her testimony, stating that she always believed J.M. but that she also believed that defendant would not do anything again. Moreover, the mother's credibility on this point was an issue for the jury to assess, not for the appellate court.

¶ 174    Ninth, defendant argues that the police did not believe J.M. because defendant was not charged after J.M.'s outcry in January 2007, but only after Y.C. also made an outcry. However, the State's burden in a criminal trial is a high one: proof beyond a reasonable doubt. Belief in a witness and proof beyond a reasonable doubt are not necessarily one and the same.

¶ 175    Tenth, defendant claims that there are inconsistencies between J.M.'s and S.B.'s testimony about who called whom and when the line went dead. However, the girls' testimony about the phone calls was remarkably consistent. J.M. testified that she was on the phone with S.B. when defendant entered her room and attacked her. When he forced himself on top of her, she tossed the telephone aside. Similarly, S.B. testified that she was on the phone with J.M. when she heard a male voice come close to the phone and then the victim disconnected the call.

¶ 176    J.M. testified that, after the attack, defendant returned to her room and apologized, and that she called S.B. and told S.B. that defendant had "raped" her. J.M. testified that she did not recall how much time elapsed between the attack and when she called S.B. because she was hysterical. Similarly, S.B. testified that, approximately 20 minutes after the first phone call was disconnected, J.M. called S.B. back crying frantically and said that "her step dad raped her." During this phone call, S.B. heard a man calling out J.M.'s name and saying he was sorry. Thus, S.B.'s testimony substantially corroborated J.M.'s testimony about their phone calls. If there were any minor inconsistencies, they were for the jury to weigh.

¶ 177    Eleventh, defendant claims that Y.C.'s testimony was not credible. Again, that was a determination for the trier of fact to make. However, even from a reading of a cold transcript,

Y.C.'s testimony appears credible, consistent and unshaken during a thorough cross-examination. Defendant argues that Y.C.'s outcry is suspect because she did not make it until J.M. told her what happened to J.M. and told Y.C. that, if defendant did anything to Y.C., she had to speak up. Again, the implication that a young girl would know how to respond properly to abuse by a parent, without advice from someone older, is an implication that the jury was free to reject. Defendant claims that Y.C. failed to identify the perpetrator of the abuse. However, this claim is flatly rebutted by the record, where Y.C. explained that she knew it was defendant because he was the only male in the house, a fact that defendant corroborated during his testimony. Y.C. further explained that her younger sister, who was then the only other person in the house, did not have big, rough hands.

¶ 178    Having thoroughly examined each of defendant's arguments, we conclude that a rational juror could have found defendant guilty beyond a reasonable doubt.

¶ 179                               II. Other Crimes Evidence[4]

¶ 180    Defendant also argues that the trial court erred in allowing the State to introduce other crimes evidence because the evidence was unreliable.

¶ 181    Section 115-7.3 of the Code of Criminal Procedure of 1963 permits the State, in sex offense prosecutions, to introduce evidence of other sex offenses by defendant. 725 ILCS 5/115-7.3 (West 2006). The jury is then allowed to consider this evidence "for its bearing on any matter to which it is relevant." 725 ILCS 5/115-7.3(b) (West 2006). The stature requires that the evidence must be "otherwise admissible under the rules of evidence" and that its "probative value" must outweigh "undue prejudice to the defendant." 725 ILCS 5/115-7.3(b), (c) (West 2006). When weighing probative value against undue prejudice:

"the court may consider:

(1) the proximity in time to the charged or predicate offense;
(2) the degree of factual similarity to the charged or predicate offense; or
(3) other relevant facts or circumstances." 725 ILCS 5/115-7.3(c) (West 2006).

¶ 182                                  A. Standard of Review

¶ 183    Defendant agrees that "[w]e review the propriety of a ruling on the admission of other-crimes evidence," pursuant to section 115-7.3 of the Code of Criminal Procedure of 1963 (quoted above), only "for an abuse of the trial court's discretion." *People v. Ward*, 2011 IL 108690, ¶ 21. "An abuse of discretion occurs when the ruling is arbitrary, fanciful, unreasonable, or when no reasonable person would adopt the trial court's view." *Ward*, 2011 IL 108690, ¶ 21.

¶ 184                               B. Preserved Issue for Review

¶ 185    The State concedes in its appellate brief that defendant preserved this issue for our review, by filing and arguing written objections to the State's motion to admit propensity evidence prior to both the first and second trials and by including the issue in a posttrial motion. *People*

---

[4]This appears as the third, rather than the second, argument in defendant's appellate brief. We placed it earlier because it relates to defendant's first argument concerning the sufficiency of the evidence.

*v. Piatkowski*, 225 Ill. 2d 551, 564 (2007). Generally, a defendant must both object at trial and in a posttrial motion to preserve an issue for appellate review. *Piatkowski*, 225 Ill. 2d at 564. The State concedes that defendant did both.

¶ 186                           C. No Abuse of Discretion

¶ 187     Defendant argues that the trial court abused its discretion by admitting evidence of (1) prior sexual abuse by defendant of J.M. and (2) subsequent sexual abuse by defendant of Y.C. The evidence was introduced as proof of defendant's propensity to commit sex crimes. Defendant argues, first, that the trial court abused its discretion because this evidence was unreliable, thereby decreasing its probative value and increasing its prejudicial effect. However, as we already discussed at length in our analysis of the sufficiency of the evidence, J.M.'s and Y.C.'s testimony appear sufficiently credible from a cold record that we could not find that the trial court abused its discretion by admitting it.

¶ 188     Second, defendant argues that, since the assaults against Y.C. occurred between a year and 2½ years after the final assault of J.M. in January 2007, "the proximity in time" factor of section 115-7.3(c)(1) is lacking. 725 ILCS 5/115-7.3(c)(1) (West 2006). Our supreme court has "decline[d] to adopt a bright-line rule" about when other crimes are *per se* too old to be admitted under section 115-7.3. Instead, it is a factor to consider when evaluating its probative value." *People v. Donoho*, 204 Ill. 2d 159, 183-84 (2003). In *Donoho*, our supreme court observed that Illinois appellate courts and federal courts have affirmed the admission of other-crimes evidence over 20 years old because the courts found the evidence sufficiently credible and probative. *Donoho*, 204 Ill. 2d at 184. In *Donoho*, the court considered other crimes that occurred 12 to 15 years earlier and held that, "while the passage of 12 to 15 years since the prior offense may lessen its probative value, standing alone it is insufficient to compel a finding that the trial court abused its discretion by admitting evidence about it." *Donoho*, 204 Ill. 2d at 184. Similarly, in the case at bar, we cannot find that the passage of only 1 to 2½ years, standing alone, is sufficient to compel a finding that the trial court abused its discretion by admitting evidence of it.

¶ 189     Third, defendant argues that the offenses against Y.C. were not sufficiently similar to the crimes against J.M. to be admitted because: (1) none of the offenses described by Y.C. involved intercourse, as they had with J.M.; (2) J.M. did not describe the offenses as occurring when she was asleep, whereas Y.C. described two of the offenses starting that way; and (3) one of the events against Y.C. occurred in a vehicle, whereas none of the offenses against J.M. occurred in a vehicle.

¶ 190     Although there were some differences, the offenses were sufficiently similar to be admitted. Both offenses involved defendant's stepdaughters who were left alone in his care. Both girls were similar in age at the time of the offenses: Y.C. was 12 years old, while J.M. was 15 years old when the charged offenses occurred. Two of the offenses related by Y.C. occurred at night while she was sleeping at defendant's home. Similarly, the offenses against J.M. occurred in her bedroom in, what was then, defendant's home. In addition, J.M.'s aunt testified that she observed an encounter between J.M. and defendant in defendant's vehicle that triggered her suspicions to the point where she confronted J.M. and demanded to know "what was going on." Similarly, Y.C. testified that defendant kissed her inappropriately in his vehicle. As a result, the trial court did not abuse its discretion by finding that the similarities

- 28 -

permitted admission of the evidence.

¶ 191                                    D. Not Exacerbated by Other Rulings

¶ 192    Defendant further argues that the trial court's alleged error in admitting evidence of defendant's other crimes was exacerbated by the fact that the trial court prohibited defendant from inquiring about a romantic relationship between J.M. and S.B. S.B.'s testimony related only to defendant's sexual assault of J.M. over the 2005 Thanksgiving break. Thus, S.B.'s testimony pertained only to this other crimes evidence, and not to the other crimes evidence involving J.M.'s sister.

¶ 193    Defendant argues that he should have been permitted to cross-examine S.B. about her prior romantic relationship with J.M. because then the jury would have had a possible explanation as to why S.B. would testify falsely on J.M.'s behalf concerning the 2005 Thanksgiving assault.

¶ 194    First, as detailed above, there was no error, so this ruling by the trial court did not exacerbate another error. Second, the State argued before the trial court that the relationship had less relevance because it began *after* J.M.'s first outcry in 2005 and ended *before* 2007 when the police first became aware of the outcry. The defense did not disagree with these dates. Third, during cross-examination at trial, the defense asked S.B. to read the police report from 2007 and had S.B. agree with it, point by point. Thus, if there were false statements made by S.B., they were first made in 2007, when she was sitting in the dean's office and speaking with a Burnham police officer over the telephone. It is not clear why, sitting in the dean's office, S.B. would think that disclosing a sexual assault would help J.M., when J.M. had asked S.B. not to tell anyone. All S.B. was told when she was called to the dean's office was that she was being called by a police officer in Chicago. She did not know why. Fourth, by that point, according to the parties' proffers, the relationship was over, so it is speculative to argue that any lingering bias on S.B.'s part would have cut in favor of J.M.

¶ 195    For all these reasons, we do not find this argument persuasive.

¶ 196                           III. Evidence Barred by the Rape Shield Statute

¶ 197    Defendant also claims that the trial court erred in barring evidence pursuant to the rape shield statute. 725 ILCS 5/115-7(a) (West 2006); *People v. Santos*, 211 Ill. 2d 395, 397 (2004) (Illinois Supreme Court acknowledged that this Illinois statute is commonly referred to as "the rape shield statute").

¶ 198                                         A. The Statute

¶ 199    The statute bars, in sex offense prosecutions, the admission of evidence of "the prior sexual activity or the reputation of the alleged victim or corroborating witness." 725 ILCS 5/115-7(a) (West 2006); *Santos*, 211 Ill. 2d at 401-02. However, the statute provides two exceptions to this otherwise "absolute[ ]" bar. *Santos*, 211 Ill. 2d at 401-02 ("the statute absolutely bars evidence of the alleged victim's prior sexual activity or reputation, subject to two exceptions"). The evidence may be admissible: (1) when consent is an issue and defendant seeks to introduce prior sexual activity between himself and the victim (or the corroborating witness); or (2) "when constitutionally required to be admitted." 725 ILCS 5/115-7(a) (West 2006); *Santos*, 211 Ill. 2d at 402. Even if one of these two exceptions applies, "[t]he court shall not admit evidence under this Section unless it determines at [a] hearing that the evidence is relevant and

the probative value of the evidence outweighs the danger of unfair prejudice." 725 ILCS 5/115-7(b) (West 2006).

¶ 200　　In the case at bar, defendant does not claim that the first exception applies. Consent was not an issue because defendant maintains that the acts never occurred. Instead, he seeks admission under the second exception. He argues that his constitutional rights required admission because the barred evidence showed that the victim's initial outcry occurred shortly after she had informed her mother about her first sexual experience with a boy her age and this evidence was probative of the truth of the victim's allegations, particularly whether she had a motive to fabricate. Defendant claims that barring this evidence violated his constitutional right to present a defense and to confront the witnesses against him. The sixth amendment to the United States Constitution provides in relevant part that, "[i]n all criminal prosecutions, the accused shall enjoy the right *** to be confronted with the witnesses against him *** and to have the Assistance of Counsel for his defence." U.S. Const., amend. VI. Similarly, our state constitution provides that, "[i]n criminal prosecutions, the accused shall have the right to appear and defend" and "to be confronted with the witnesses against him." Ill. Const. 1970, art. I, § 8.

¶ 201　　　　　　　　　　　　　　　B. Standard of Review

¶ 202　　Defendant acknowledges that, generally, a trial court's decision to bar evidence is reviewed only for an abuse of discretion. *People v. Santos*, 211 Ill. 2d 395, 401 (2004) ("Evidentiary rulings are reviewed for abuse of discretion."). Thus, for example, when our supreme court considered whether a trial court properly barred evidence pursuant to the rape shield statute and whether or not the statute's second exception applied, the supreme court applied an abuse-of-discretion standard. *Santos*, 211 Ill. 2d at 401, 403.

¶ 203　　While acknowledging the general application of an abuse-of-discretion standard, defendant argues that, in this particular case, we should apply a *de novo* standard of review because none of the underlying facts are in dispute. In making this argument, defendant does not identify the facts which he claims are not in dispute. Defendant argues that he was constitutionally entitled to present this evidence because the mother "could have been" angry when the victim told her of the victim's prior consensual sexual experience and thus the victim "may" have fabricated allegations against defendant in order to deflect her mother's possible anger. When even the defendant cannot describe the underlying facts of his argument without using words like "may" and "could have been," it then becomes difficult for him to argue that these underlying facts are concrete and beyond dispute. Thus, we will apply the abuse-of-discretion standard which is typically used. *Santos*, 211 Ill. 2d at 401, 403.

¶ 204　　　　　　　　　　　　　　　C. Preserved Issue

¶ 205　　The State concedes in its appellate brief that defendant preserved this issue for our review by raising it in a motion *in limine* and in a posttrial motion. *Piatkowski*, 225 Ill. 2d at 564. As we already observed above, generally, a defendant must both object at trial and in a posttrial motion to preserve an issue for appellate review. *Piatkowski*, 225 Ill. 2d at 564. The State concedes that defendant did both.

¶ 206　　Thus, *if* we conclude that the trial court abused its discretion in denying the evidence, the burden would then be on the State to show that any error was harmless beyond a reasonable

doubt. *People v. Johnson*, 238 Ill. 2d 478, 488 (2010); *People v. McLaurin*, 235 Ill. 2d 478, 495 (2009). However, before considering whether any error was harmless, we must first determine whether the trial court erred at all. *Piatkowski*, 225 Ill. 2d at 565 ("the first step is to determine whether error occurred").

¶ 207                                    D. Offer of Proof

¶ 208        The State argues the trial court did not err because defendant failed to make an adequate offer of proof to justify barring the evidence. In response, defendant acknowledges that he had the burden to make an offer of proof, but argues that his offer was adequate.

¶ 209        The rape shield statute provides that "[n]o evidence" is admissible under this statute "unless" defendant makes "an offer of proof" at an *in camera* hearing. 725 ILCS 5/115-7(b) (West 2006). However, the statute goes on to state that the purpose of this hearing is "to determine whether the defense has evidence to impeach the witness in the event that prior sexual activity with the defendant is denied." 725 ILCS 5/115-7(b) (West 2006). This purpose makes sense only in the context of the first exception, when evidence of the victim's past sexual conduct with the defendant is introduced to support a consent defense. 725 ILCS 5/115-7(a) (West 2006). Thus, the express language of the statute is ambiguous as to whether the statute requires an offer of proof when defendant seeks admission under the second exception.

¶ 210        However, in general, when a trial court bars evidence, no appealable issue exists unless the denied party makes an offer of proof. *People v. Peeples*, 155 Ill. 2d 422, 457 (1993); *People v. Pelo*, 404 Ill. App. 3d 839, 875 (2010). The purpose of an offer of proof is: (1) to disclose to the trial court and opposing counsel the nature of the proposed evidence so that the trial court may take appropriate action; and (2) to provide the reviewing court with an adequate record to determine whether the trial court's action was in error. *People v. Thompkins*, 181 Ill. 2d 1, 10 (1998); *Peeples*, 155 Ill. 2d at 457; *Pelo*, 404 Ill. App. 3d at 875. If a criminal defendant claims on appeal that he was not able to prove his case because the trial court improperly barred him from presenting evidence but he failed to make an adequate offer of proof, he forfeits review of the issue on appeal. *Peeples*, 155 Ill. 2d at 457; *Pelo*, 404 Ill. App. 3d at 875.

¶ 211        Although the express language of the statute does not require an offer of proof under the second exception, there is also nothing in the statute eliminating the general rule that an offer of proof is required. Thus, we agree with the parties that defendant was required to make an adequate offer of proof.

¶ 212        In defendant's offer of proof, defense counsel read from a Burnham police report which disclosed that J.M. "stated that she told her mom days before about having had sex for the first time with a boy her own age." Defendant argues that J.M.'s outcry was motivated by her desire to deflect her mother's anger regarding J.M.'s sex with a boy. However, there is no evidence that J.M.'s mother was, in fact, angry about J.M.'s consensual sexual experience, and defendant argues weakly only that the mother "could have been" angry about it. As a result, we cannot find that the trial court abused its discretion by denying defendant's motion.

¶ 213        In addition, any error was harmless beyond a reasonable doubt. *Johnson*, 238 Ill. 2d at 488; *McLaurin*, 235 Ill. 2d at 495. To the extent that defendant wanted to argue that J.M.'s outcry was a fabrication to deflect her mother's anger, the record was full of testimony about J.M.'s bad behavior and her mother's frustration with it and the accompanying punishments. The bad

- 31 -

behavior included smoking marijuana and slipping grades. If defendant had wanted to argue that the outcry was a fabrication by J.M. to deflect her mother's anger about J.M.'s "acting out," there was already evidence in the record to support such an argument, without dredging up the victim's sexual history. In fact, defendant did argue in closing that J.M. used her allegations against defendant to justify her own bad behavior. As a result, we cannot find that any error, if there was error, was prejudicial.

¶ 214                                          CONCLUSION

¶ 215        For the foregoing reasons, we do not find defendant's arguments persuasive and affirm his conviction and sentence.

¶ 216        Affirmed.